633 So.2d 1258 (1994)
GULF STATES UTILITIES COMPANY
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 92-CA-1185.
Supreme Court of Louisiana.
March 17, 1994.
*1259 Michael R. Fontham, Paul L. Zimmering, Noel J. Darce, Alex J. Peragine, Stone, Pigman, Walther, Wittman & Hutchinson, New Orleans, Carolyn DeVitis, Baton Rouge, for applicant.
Tom F. Phillips, James L. Ellis, Taylor, Porter, Brooks, & Phillips, Baton Rouge, Richard P. Ieyoub, Atty. Gen., Jack E. Yelverton, Central City, for respondent.
LEMMON, Justice[*].
This is a direct appeal by the Louisiana Public Service Commission (the Commission) from a judgment of the trial court in favor of Gulf States Utilities Company (GSU) reversing and vacating the portion of Order No. U-17282-H of the Commission which excluded GSU's recovery of certain items through the fuel adjustment charges to ratepayers.[1]

Facts
In the early 1980's, CITGO Petroleum Corporation, Conoco, Inc., and Vista Chemical, three industrial customers of GSU, were considering construction of cogeneration facilities for production of electricity and steam, using petroleum coke instead of natural gas as fuel for the generating units.[2] The industrial customers invited GSU to join in the project. Anxious to avoid the tremendous loss in revenue (perhaps $25 million annually) which would be caused by the departure of these industrial customers from the GSU system, as well as the resulting adverse impact on other customers,[3] GSU and the three industrial customers negotiated an agreement for a $200 million cogeneration construction project. Under the contract, GSU agreed to transfer its two oldest gas-fired electricity generation units at the Nelson station in Lake Charles to Nelson Industrial Steam Company (NISCO), a partnership to be formed between GSU and the three customers. In exchange for the transfer of ownership, NISCO obligated itself to pay GSU $6.35 million annually over the next twenty years.[4]
*1260 As part of the undertaking, GSU contracted to operate the units, being compensated for this service by NISCO, and to purchase the electricity produced, using the electricity to serve GSU's customers (including the three industrial participants). The industrial participants bound themselves to purchase their steam from NISCO and their electricity from GSU, and further agreed to invest approximately $150 million to convert the facility into a fluidized bed combustion plant capable of burning certain solid fuels, particularly petroleum coke which was abundantly available in the area.
The contract set forth a complex formula for calculating the price that GSU was to pay to NISCO for the purchase of electricity over the twenty-year period. This purchase price of electricity, which was calculated without reference to the "avoided cost,"[5] included an "asset fee" that represented NISCO's recoupment of the cost of purchasing the two Nelson units from GSU. Because the units had been constructed in 1959 for $38 million and GSU had recovered $29 million, between the time of construction and the 1986 NISCO contract, from ratepayers through depreciation in base rates, the depreciated book value of the units at the time of the transfer was $9 million. Therefore, a major portion of the $48 million purchase price by NISCO represented a "gain" for GSU over the depreciated book value of the units.
The basis of the dispute in this case is GSU's passing along to ratepayers, through the fuel adjustment clause,[6] that part of the "asset fee" which represented GSU's "gain." The Commission characterized this as "double payment" by the ratepayers for the cost of the Nelson units, contending that (1) GSU collected the initial $29 million depreciation from the ratepayers from 1960 to the date of NISCO purchase and (2) GSU was collecting a second time on that portion of the rates paid by ratepayers attributable to the part of the "asset fee" which was a "gain" for GSU from the sale of the units.
Order No. U-17414Proceedings to Approve the NISCO Contract
In 1986 GSU filed an application with the Commission for approval of the proposed NISCO contract, as required by the Commission's rules governing the purchase of electricity by regulated utilities from qualifying cogeneration facilities.[7] The application, in which the three industrial participants intervened, specifically stated that the Commission's approval and acceptance of the rates for GSU's purchase from qualifying facilities was necessary for inclusion of the rates as a purchase power cost under the Commission's fuel adjustment order. GSU further represented that the arrangements were beneficial to GSU's retail customers and at least were preferable to loss of the three industrial customers. GSU asserted that it did not have the financial resources, by itself, to convert the two units to coke fuel.
The Commission ordered a public hearing before a hearing officer regarding GSU's application for approval of the NISCO contract. GSU's representative asserted that GSU would enjoy three advantages from its participation in the joint venture. First, GSU would retain the revenues that it had been receiving from the three industrial customers. Second, this was an opportunity for GSU to participate in new technology using low cost, locally produced fuel which is a by-product of petroleum refining.[8] Third, GSU *1261 was not required to put any cash into the project or incur any long term debt, since the industrial participants were to pay all costs of modifying the units.[9]
The Commission then conducted an open session meeting in July, 1987, at which discussions focused primarily on the benefits of the joint venture to other ratepayers. A report to the Commission by its economist noted that the rates of other ratepayers would be increased either by self-generation by the industrial participants or by the joint venture, but the latter increase would be offset somewhat by a fall in base rates. The economist noted that the other ratepayers not only would be hurt less in the short run by approval of the joint venture, but also would benefit in the long run from the joint venture.[10] At the end of the meeting, the Commission voted unanimously in favor of the NISCO project and issued Order No. U-17414, granting approval of the contract as written. The parties then executed the contract and began the project.
Order No. U-17282-HProceedings in GSU's Rate Application Involving Nuclear Plant
In November, 1989, GSU filed a rate increase application with the Commission relating to expenses associated with its River Bend nuclear plant, a facility unrelated to the NISCO venture. This rate increase application represented the third step of a court-mandated phase-in plan whereby the increases in GSU's rates related to the River Bend nuclear plant were to be implemented in annual increments over a five-year period. In determining the appropriateness of the requested rate increase, the Commission not only looked at the revenue picture for the River Bend nuclear project, but also examined GSU's other revenue, including that from the NISCO transaction.
After public hearings concerning the rate increase application, the Commission issued Order No. U-17282-H which included a requirement that the portion of the $6.35 million annual payment representing the "gain" received by GSU on the sale of the generating units to the NISCO joint venture be eliminated from the fuel adjustment clause in the rates charged to ratepayers. In the order, the Commission noted the following:
The company [GSU] has recovered the vast majority of the costs associated with the Nelson units over their useful life through the inclusion of those units in rate base and recognition of the operating costs as cost of service expenses for ratemaking purposes. Gulf States is paying NISCO for all of the costs associated with the production of electricity from those plants. Included within those costs are the annual $6.35 million payments by the industrial customers to Gulf States. Therefore, although GSU is receiving payments of $6.35 million per year, its ratepayers are the ones actually absorbing that cost. Ratepayers are being penalized by this transaction. It was never the Commission's intent to have ratepayers pay more than they would have had the NISCO transaction not occurred. Yet that is precisely the result being achieved. For the foregoing reasons we find it appropriate to exclude the gain portion of the NISCO annual payments from recovery through the fuel clause.
Gulf States contends that the Commission may not preclude recovery of the payments made for the profit associated with the NISCO transaction because the Commission previously approved the accounting treatment of the salewhich included below-the-line treatment[[11]] of the present value of Gulf States' gain. However, the approval of the below-the-line treatment of *1262 the gain received from NISCO is not the same as foreordaining that ratepayers must supply the funds through the fuel clause to finance the payment of a windfall to shareholders. Ratepayers already paid once for the Nelson units through depreciation reflected in base rates; they should not be required to pay twice. Further, the fuel clause issue relating to the NISCO sale was not fully analyzed in the prior proceeding. Therefore, Gulf States will be directed not to include to [sic] gain-related payments in its fuel costs.

Proceedings in the District Court
GSU appealed this order to the district court, arguing that the Commission's approval of the NISCO contract included an approval of all costs to be recovered by GSU under the contract through the fuel adjustment clause. After issuing a preliminary injunction as to the portion of the order requiring exclusion from GSU's fuel adjustment clause of any gain realized from the sale of the units in the NISCO transaction, the district court rendered a judgment reversing and vacating the Commission's order. In oral reasons for judgment, the court noted that "rate-making is a function of the Public Service Commission that is never res judicata." However, relying on this court's decision in Louisiana Gas Serv. Co. v. Louisiana Pub. Serv. Comm., 245 La. 1029, 162 So.2d 555 (1964), the court held that the present case is not a rate case, "but involves a contractual obligation that was entered into and approved by the Public Service Commission, and the rates that were approved were in connection with the contract of selling those units." The court noted that the Commission had "approved the sale of the generating units, the purchase of the cogenerated electricity and the recovery of Gulf States' costs through the monthly fuel adjustment clause, pursuant to the NISCO contract." Holding that these contractual obligations cannot be impaired, the court reversed and vacated Order No. U-17282-H "with respect to the rate reduction for any gain from the sale of the Nelson Station generating units reflected in the NISCO purchase power cost which may be charged in the monthly fuel adjustment clause."

Effect of Approval of NISCO Contract
On appeal to this court, the outset issue is the effect of the Commission's Order No. U-17414. The Commission argues that its order approving the NISCO contract does not preclude its making a later modification of GSU's fuel adjustment clause in an unrelated rate-making case. On the other hand, GSU argues that it disclosed in its application for Commission approval the proposed collection of the entire "asset fee" through the fuel adjustment clause and that it would not have participated in the $200 million NISCO project without the Commission's total approval of the entire contract, including use of the fuel adjustment clause to collect all of the asset fee.
The Commission's 1982 Order No. U-14964, governing the purchase of electricity by utility companies from qualifying cogeneration facilities, was issued in part to require regulated utilities to purchase electricity produced by unregulated cogenerators under specified conditions, and the rates, terms and conditions are provided in the order. The order contemplates that the purchase price will be at "avoided cost." However, Section 201(b) allows a negotiated contract for a different rate (or term or condition). Here, the parties negotiated a purchase price higher than the "avoided cost" paid to other cogenerators, calculated at the current gas prices. The tenor of the evidence, however, was that the customers would ultimately benefit from the project, especially when the generating units were converted to use the less expensive coke fuel.
In the open session before the Commission, there was discussion of GSU's "gain" from the sale of the units, but no one mentioned that GSU was to add that "gain" to the "running costs" to be recovered through the fuel adjustment clause.[12]
The Commission, in the proceeding leading to the order approving the NISCO contract, *1263 simply did not purport to fix the elements of the fuel adjustment clause for the next twenty years. The discussion at the hearing was centered around the overall benefit of the NISCO contract to other ratepayers. The commissioner who made the motion at the end of the hearing spoke in terms of entering an order of no objection. Another commissioner commented, "We're not ordering, we're approving." There was no specific rate-making aspect of the proceeding, especially with regard to approval of GSU's recovering investment costs from ratepayers through the fuel clause.
Moreover, while Section 201(c) of Order No. U-14964 requires the Commission's approval of a utility's contract for purchasing electricity from qualifying facilities, the contract is automatically approved if the Commission does not act within sixty days. This is hardly the type of approval which would freeze the contract rates, including the use of the fuel adjustment clause to recover all of the "asset fee," for the twenty-year term of the contract.
We conclude that the Commission's order approving the NISCO contract essentially approved the transfer of the units and the general formula for GSU's purchase price of electricity from NISCO, without granting untouchable status for twenty years to the fuel adjustment clause. The NISCO contract contained complex formula for calculating the rates GSU paid NISCO for electricity at various stages over the twenty-year contract. The Commission's approval of the contract for GSU's purchasing electricity from NISCO could not be viewed as precluding the Commission's future adjustments of the rates that GSU charged to ratepayers.[13]
Moreover, nothing precluded the Commission in the River Bend rate case from investigating all aspects of GSU's operations. The Commission could also modify the rate charged to ratepayers for electricity when it discovered GSU's "double recovery" of the original Nelson units investment in an unrelated proceeding, as long as there was no denial of GSU's procedural due process rights of notice and opportunity to be heard.[14]See Conoco, Inc. v. Louisiana Pub. Ser. Comm., 520 So.2d 404 (La.1988).

Impairment of Contract
GSU contends that the Commission's modification of the fuel adjustment clause in GSU's River Bend rate proceeding, even if not precluded by the Commission's earlier order approving the NISCO contract, constitutes an impairment of the obligations of the contract between GSU and NISCO. GSU argues that the Commission cannot constitutionally issue an order which impairs the obligations of parties to a preexisting contract, particularly a contract which has been approved by the Commission.
La. Const. art. IV, § 21(B) grants the Commission constitutional jurisdiction over public utilities.[15] This provision has been interpreted as affording the Commission broad, independent and plenary regulatory powers over public utilities. This plenary authority includes the right to exercise all necessary power and authority over public utilities for the purpose of fixing and regulating rates charged or to be charged by, and service furnished by, such public utilities. Daily Advertiser v. Trans-La (A Division of Atmos Energy Corp. d/b/a Energas Co.), 612 So.2d 7 (La.1993); Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm., 609 *1264 So.2d 797 (La.1992); Gulf States v. Louisiana Pub. Serv. Comm., 578 So.2d 71, cert. denied, ___ U.S. ___, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991). The regulation of public utilities is allowed as an exercise of police power, which is the power of the state to regulate reasonably the actions of its citizens in order to protect or promote the public welfare. Conoco, Inc. v. Louisiana Pub. Ser. Comm., 520 So.2d 404 (La.1988); Louisiana Gas Serv. Co. v. Louisiana Pub. Serv. Comm., 245 La. 1029, 162 So.2d 555 (1964).
La. Const. art. I, § 23 prohibits the enactment of laws impairing the obligations of contracts.[16] Nevertheless, this court has repeatedly held that "where there is actual conflict between the rate-making power and the right of contract, and the public interest requires it, then contractual obligations must yield to the rate-making power of the State." Conoco, Inc. v. Louisiana Pub. Serv. Comm., 520 So.2d at 407. See also City of Plaquemine v. Louisiana Pub. Serv. Comm., 282 So.2d 440 (La.1973); Louisiana Gas Serv. Co. v. Louisiana Pub. Serv. Comm., 245 La. 1029, 162 So.2d 555 (1964). On the other hand, contracts may not be abrogated by the exercise of police power unless it is for a public end and the result is reasonably adapted to that end with careful consideration of all circumstances and a clear showing that the public interest requires such abrogation. Finally, the means by which a contract is impaired pursuant to state powers must not be arbitrary, unreasonable or oppressive. Conoco, Inc. v. Louisiana Pub. Serv. Comm., 520 So.2d 404 (La.1988).
Accordingly, any conflict between GSU's contractual right to recover from ratepayers, through the fuel adjustment clause, the entire amount GSU pays NISCO for electricity (which includes GSU's "gain" portion of the "asset fee") and the duty of the Commission to promote the public welfare by regulating rates must be resolved in terms of balancing these competing interests.
GSU's primary obligations under the NISCO contract were to sell NISCO two gas-fired generating units, apparently at current market value, to operate the units for compensation, and to purchase the electricity generated by NISCO at a price to be calculated under a complex formula that varied as the units were to be converted to use of coke fuel. GSU's general argument that it would not have undertaken a $200 million project[17] without approval of the entire contract primarily addresses its obligation for the purchase price of electricity from NISCO, the entirety of which it intended to flow through the fuel clause to the ratepayers.
This case is vastly different from the Louisiana Gas Serv. Co. decision relied on by the trial court. In that case the Commission approved new rates which were expressly designed to provide revenue for specific capital improvements that the parties then constructed in reliance on the revenues. The Commission's subsequent disallowance of the rate increase constituted detriment to the parties and was an arbitrary and unreasonable abuse of power.
In the present case, the Commission did not expressly approve GSU's flowing through the fuel adjustment clause that portion of the "asset fee" that represented its "gain" in the NISCO sale. GSU may have relied to some extent on this unusual use of the fuel clause when it obligated itself to purchase electricity from NISCO, but this use of the fuel clause was not a primary motivation for GSU's participation in this complex undertaking. The Commission approved the complex formula for GSU's purchase price from NISCO, but GSU had to know that the Commission could not expressly approve in advance the entirety of the vast and non-detailed expenditures for the project that would eventually go into the rate-making process as to GSU's customers. Moreover, the Commission exercised its rate-making power in this case to remedy GSU's unusual use of the fuel adjustment clause to recover original investment costs which GSU had already recouped from the *1265 ratepayers.[18] Any contractual obligations impaired in this case must yield to the Commission's exercise of its regulatory powers for the promotion of the public good. The import of the Commission's order was simply to remove the "gain" from the fuel adjustment clause. We conclude that the Commission did not abuse its powers in issuing the order modifying the fuel adjustment clause.

Decree
For these reasons, the judgment of the district court is reversed, and the portion of Order No. U-17282-H of the Louisiana Public Service Commission that had been vacated by the district court is reinstated.
DENNIS, J., concurs with reasons.
DENNIS, Justice (concurring).
I respectfully concur.
When the Public Service Commission approved the cogeneration contract between Gulf States Utilities Company and third parties, the Commission knew or should have known that GSU planned for its ratepayers ultimately to pay for the $39 million profit GSU would make in the sale of the generation units to NISCO. The LPSC internal memoranda confirm that the LPSC's own economist and hearing examiner were fully aware that GSU intended to flow through the cost of the Nelson units to the ratepayers through the fuel adjustment clause and that the rates paid to NISCO by GSU were to allow for recovery of all of the joint venture's investments including the gain realized by GSU. The LPSC's economist alerted the LPSC to this plan and made recommendations to alter GSU's plan: "I would suggest that some of the ... benefit, perhaps half, should accrue to ratepayers in the form of an additional decrease in revenue requirements." January 9, 1987, Memorandum to LPSC from Dr. Sharon Rochford, Page 7. Roy F. Edwards, the hearing examiner, alerted the LPSC to the issue of the flow through of the gain when he advised the LPSC that if GSU experiences a gain on the transfer of Nelson 1 and Nelson 2 to the joint venture, such gain should be recognized for ratemaking purposes. January 21, 1987 Memorandum to LPSC from Roy F. Edwards, Page 8.
Nevertheless, the Commission approved of GSU's entering into the cogeneration contract by a unanimous oral vote. The transcript of the Commission proceedings, in pertinent part, reads as follows:
COMMISSIONER LAMBERT: I move that we issue a no objection or whatever we have to do to move this on. What is the request before us?
CHAIRMAN SCHWEGMANN: I think it was Commissioner Powell who first mentioned the subject. Commissioner, do you have guidance for us in this matter?
COMMISSIONER LAMBERT: Do you want to make the motion?
COMMISSIONER POWELL: That's what I said, I'd like to make a motion for this application of Gulf States Utilities, for approval to enter a contract withit's got Section 201, Order No. U-14964
COMMISSIONER LAMBERT: I second the motion.
CHAIRMAN SCHWEGMANN: For my understanding of the motion, are we ordering they enter into this, or are we acquiescing?
COMMISSIONER ACKEL: I believe we're
COMMISSIONER LAMBERT: We have no objection.
COMMISSIONER POWELL: We're just approving this application.
CHAIRMAN SCHWEGMANN: Okay.
COMMISSIONER POWELL: We're not ordering, we're approving.
CHAIRMAN SCHWEGMANN: We have a motion, we have a second, is there any discussion? Hearing none, all those in favor? The Commission unanimously approved the application of Gulf States.
Minutes from June 23, 1987 Open Session of the Louisiana Public Service Commission Relative to Docket No. U-17414, page 24-25.
Serious questions are raised by GSU's arguments that the Commission should be barred by estoppel or res judicata from disallowing *1266 part of the cogeneration contract in a rate proceeding three years subsequent to Commission approval and effectuation of the agreement. These issues are alluded to but not fully addressed by the majority opinion. I believe that the majority has reached the correct result, however, based on my understanding and application of the following principles.
The problems of applying equitable estoppel against governmental agencies are outlined by II Davis and Pierce, Administrative Law Treatise § 13.1 (1994) as follows:
The Court has come close to saying that the government can never be equitably estopped based on a false or misleading statement of one of its agents no matter how much an individual has relied on that statement to her detriment or how reasonable her reliance. * * *
The Court's extreme reluctance to hold the government estopped is obvious from the pattern of its decisions. That reluctance is also understandable. The federal government implements hundreds of extraordinarily complicated regulatory and benefit programs. Millions of civil servants give advice to citizens daily concerning their rights and duties under these programs. Erroneous advice is both inevitable and commonplace. * * *
Estopping the government based on the misrepresentations of its agents would have a series of adverse effects. The most immediate result would be a financial loss of some magnitude to the government. If the government began to lose much money as a result of estoppel cases, agencies would respond by limiting severely the availability of information and advice from government employees. That, in turn, would cause extreme harm to the public for four reasons: (1) All citizens need advice concerning a variety of complicated government programs; (2) most of the advice provided by government employees is accurate and helpful; (3) advice from government is free; and (4) advice from alternative sources that may be more reliable is often very expensive.
* * * * * *
The Court's unwillingness to say that estoppel is "never" available against the government is also understandable. The Justices undoubtedly are concerned that they may ultimately confront a case in which judicial refusal to estop the government would produce consequences so manifestly unfair to an individual that the Court is willing to treat the case as a rare exception to its general prohibition against estoppel. Such a case would have to involve at least the following characteristics: (1) unequivocal advice from an unusually authoritative source; (2) reasonable reliance on that advice by an individual; (3) extreme harm resulting from that reliance; and (4) gross injustice to the individual in the absence of judicial estoppel. [T]he Court's opinion in United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655 [93 S.Ct. 1804, 36 L.Ed.2d 567] (1973), seemed to reflect exactly this reasoning.
Of course, the state government does not implement as many programs or give advice as often as the federal agencies, and Public Service Commission approval of a cogeneration contract is not quite the same thing as taxpayer advice provided by the IRS, but the underlying policies and practical problems are similar enough to make the same principles applicable here. Applying them, I conclude that: (1) although the Commission is an unusually authoritative source, its "advice" or approval in this case was not "unequivocal" with respect to allowing GSU to pass the cost of its profit-taking in the sale of its generating units on to the ratepayers; (2) GSU did not reasonably rely on the Commission's oral vote approval of the cogeneration arrangement as encompassing all aspects of GSU's plans for its effectuation; GSU could have pressed for a detailed written order or a particularized oral declaration from the Commission on the issue but instead chose to rely on the somewhat ambiguous oral statements of the commissioners; (3) and (4) GSU does not appear to have suffered extreme harm or gross injustice; even after the Commission's adjustment in the rate case, GSU fared better before the Commission than it did before the Texas Public Utility Commission with respect to the same cogeneration contract; *1267 prior to the Commission hearing on the cogeneration contract, the Commission's experts called attention to the inequity of making the ratepayers pay twice for the generating units and recommended corrective action; thus, without the later adjustment in the rate case, it appears that GSU would have received an undeserved windfall at the ratepayers' expense.
Regarding res judicata, we have recognized that courts in general hesitate to apply claim or issue preclusion to enforce the repose of administrative agency actions unless the agency has acted in a judicial capacity to resolve disputed issues properly before it which the parties have an adequate opportunity to litigate. Turner v. Maryland Cas. Co., 518 So.2d 1011, 1016 (La.1988), citing United States v. Utah Construction & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), Restatement of Judgments 2nd § 83 (1982), and K. Davis Administrative Law Treatise § 21.1 et seq.
The Second Restatement of Judgments deals with res judicata of administrative determinations in § 83, which, in pertinent parts, provides:
* * * * * *
(2) An adjudicative determination by an administrative tribunal is conclusive under the rules of res judicata only insofar as the proceeding resulting in the determination entailed the essential elements of adjudication, including: * * * (c) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof: * * * (e) Such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions.
Further, § 83, Comment: "b. Rationale." provides in general that where an administrative forum has the essential procedural characteristics of a court, its determinations should be accorded the same finality that is accorded the judgment of a court. However, in this respect it is necessary to differentiate between claim and issue preclusion. In particular, that section of the Comment states:
Considered analytically, adjudication of a claim is impossible unless the matter for decision includes a legal claim, that is, an assertion by one party against another cast in terms of entitlement under substantive law to particular relief, including determination of legal status. For this purpose legal claims include claims of entitlement asserted by or against the government, as when the government seeks to recover a tax obligation or when a claim based on legal right is prosecuted against the government. A petition for a benefit from the government is not a legal claim unless the agency is obliged to grant the petition upon a showing of the existence of conditions specified by law. * * *
Administrative proceedings having some primary object other than the determination of a claim can have issue preclusive effects. The essential question is whether, within the context of the larger purpose of an administrative proceeding, an issue is formulated as it would be in a court and decided according to procedures similar to those of a court. An issue of law is so formulated when there is assertion and controversion of the meaning of an existing rule as applied to specific circumstances actual, or hypothetical as in the case of a declaratory proceeding, see § 33. An issue of fact is so formulated when there is assertion and controversion of the occurrence of a legally significant event. * * * If an issue has thus been formulated, and if the procedure for resolving it is substantially similar to that used in judicial adjudication, the agency's determination of the issue should be given preclusive effect in accordance with the rules of res judicata.
Applying the foregoing principles, I conclude that the Commission's approval of GSU's cogeneration agreement with third parties was not a valid and final adjudicative determination by an administrative agency having the same effects under the rules of res judicata as a judgment of a court. First, the agency did not act in a judicial capacity *1268 to resolve disputed issues properly before it which adverse parties have had an adequate opportunity to litigate. Second, the Commission's proceeding did not entail some of the essential elements of adjudication, such as a formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof and such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain evidence and formulate legal contentions. Third, the matter for the Commission's decision did not include a legal claim, that is, an assertion by one party against another cast in terms of entitlement under substantive law to particular relief, including determination of legal status. GSU did not assert a claim of entitlement against the government or controvert the obverse of this situation; GSU's petition for a benefit from the government was not a legal claim because the agency was not obliged to grant the petition upon a showing of the existence of conditions specified by law. Fourth, the proceedings did not have issue preclusive effects because the issue in question was not formulated as it would be in a court and decided according to procedures similar to those of a court.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, HALL, J. was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] La. Const. art. IV, § 21 grants a right of direct appeal to the Supreme Court from a judgment of the district court concerning any action by the Commission.
[2] Cogeneration facilities are those constructed for the dual purpose of producing electrical power and useful thermal energy, such as heat or steam, to perform work. Plants meeting this definition are termed "qualifying facilities." Charles F. Phillips, Jr., The Regulation of Public Utilities 442 (2d ed. 1988).
[3] If the three industrial customers had left the GSU system, GSU's fixed costs would have been reallocated among the remaining customers to make up the loss in revenue.
[4] While the purchase price was not specified, the estimated present net value, in 1986, of a revenue stream of $6.35 million over twenty years was approximately $48 million.
[5] "Avoided cost" is defined in the Commission's Order No. U-14964 as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source."
[6] An automatic fuel adjustment clause, usually established at a rate hearing, permits adjustment of rates on an ongoing basis to reflect fluctuations in specific operating costs. The clause allows utilities to pass fluctuating fuel costs along to customers as the costs are incurred, without filing numerous rate cases, and the customer's rate varies directly with the utility's fluctuating costs. See Daily Advertiser v. Trans-La (A Division of Atmos Energy Corp.), 612 So.2d 7 (La. 1993). This amount is approved on a monthly basis by the Commission.
[7] See Commission Order No. U-14964. The application in this case requested, among other things, that the Commission designate the NISCO joint venture as a qualifying facility.
[8] The Lake Charles area produces about three times the coke required for the project.
[9] GSU was to have one percent of the ownership of the joint venture, while bearing none of the modification debts. GSU also sold its two oldest gas-fired units, presumably at market value, and was to be compensated by NISCO for operating the units.
[10] The economist, as well as the hearing examiner and a Commission consultant, all recommended that part of GSU's "gain" on the sale of the two units be applied to the benefit of the ratepayers in the form of a decrease in revenue requirements. These recommendations were not brought out in the discussions before the Commission at the open session hearing.
[11] Below-the-line treatment means treatment as non-utility income, which solely benefits GSU's shareholders.
[12] Normally, a utility recovers only fuel and other fluctuating costs from ratepayers through the fuel clause. Investment costs are normally recovered in base rates. When a utility purchases electricity, the "running costs" are the variable operating costs incurred by the other party.
[13] Whether future adjustments may impair the obligations of contracts is discussed in another section.
[14] GSU does not dispute the Commission's assertion that it announced in the Phase II proceeding that it would fully investigate all of GSU's operations in the Phase III proceeding. The only part of the Phase III proceeding presently before the court is that relating to the NISCO transaction. In its order after the Phase III hearing (the order presently before the court), the Commission noted that although GSU had "a revenue deficiency in its non-River Bend revenue requirements, Gulf States did not request a rate increase to compensate for this deficiency."
[15] La. Const. art. IV, § 21(B) provides:

The commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law.
[16] La. Const. art. I, § 23 provides:

No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted.
[17] GSU had no obligation to contribute cash or to incur any long term debt in connection with the venture.
[18] A utility cannot transfer generating units to obtain a stepped-up basis for the assets.