789 So.2d 554 (2001)
SHOWBOAT STAR PARTNERSHIP, Showboat of Louisiana, Inc., and Lake Pontchartrain Showboat, Inc.,
v.
Ralph SLAUGHTER, Secretary of the Department of Revenue and Taxation, State of Louisiana.
No. 2000-C-1227.
Supreme Court of Louisiana.
April 3, 2001.
Dissenting Opinion on Denial of Rehearing May 11, 2001.
*555 Geneva Landrum, Shanda J. McClain, Robert F. Mulhearn, Jr., Baton Rouge, Counsel for Applicant.
James C. Exnicios, Neal J. Favret, New Orleans, Lloyd E. Hogue, Kenner, Counsel for Respondent.
LEMMON, Justice.
This is a suit for refund of state sales and use taxes paid under protest. Plaintiffs-taxpayers are a group of three entities that own and operate a riverboat gaming vessel. The Department of Revenue and Taxation assessed the taxes at issue on plaintiffs' purchases of certain "gaming equipment," including slot machines, roulette tables, cabinets, currency conveyor systems, surveillance equipment and illuminated signs, that was installed during construction on the vessel. In doing so, the Department rejected plaintiffs' claim for an exemption of the equipment as component parts of the vessel under La.Rev. Stat. 47:305.1A. While the lower courts determined that the taxes were due, those courts nonetheless concluded that the doctrines of detrimental reliance and equitable estoppel precluded the Department from collecting not only the interest, but also the taxes due.

Facts
The facts are virtually undisputed.[1] In 1991, the Internal Revenue Service and the Department created a joint task force to study the new gaming industry that was being introduced into Louisiana and to educate and assist members of this new industry with various tax issues. The task force's functions included holding educational meetings with the new gaming industry members. Earl Millet, a regional tax director, and John McShane, a revenue audit manager, represented the Department on the task force.
One tax issue facing the industry was whether purchasers of riverboats for conducting gaming may invoke the sales tax exemption for materials, equipment, and machinery incorporated into vessels built in Louisiana. This exemption is authorized by La.Rev.Stat. 47:305.1A, which provides in part:
The tax imposed by R.S. 47:302(A)(1), 321(A)(1), and 331(A)(1) shall not apply to sales of materials, equipment, and machinery which enter into and become component parts of ships, vessels, or barges, including commercial fishing vessels, drilling ships, or drilling barges.... (emphasis added).
*556 Two years after the task force was formed, Barbara Roe, a Senior Agent in the Research and Technical Division of the Department, addressed the issue in writing in an internal memorandum, dated June 16, 1993, to McShane. The memorandum, discussing vessels which satisfy the size requirement (which most of these riverboats do), stated that:

All original purchases of equipment to outfit the vessels including the gambling machines would also be eligible for the exemption provided under that statute. Any tangible personal property that is needed for the vessel to function will be included in the exemption. This includes even such things as linens, eating utensils, glasswares, etc. (emphasis added).
On August 3, 1993, plaintiffs' representatives attended a meeting of the task force, at which Millet and McShane informed them, in accordance with Roe's memorandum, that gaming equipment purchased for installation on a riverboat during construction of the vessel would qualify for the component parts exemption under Section 305.1A. The task force also provided plaintiffs with sales tax exemption forms and instructed them to give the exemption certificates to the equipment vendors at the time of purchase so that no sales or use tax would be imposed.
Plaintiffs, relying on the Department's representations, used the exemption certificates in purchasing various gaming equipment for installation during construction on their riverboat vessel, without paying sales or use taxes. These purchases occurred after the August 1993 meeting and during the construction of the vessel. Title to the completed vessel passed on November 8, 1993. The vessel was the first to begin operations as a riverboat under the new gaming laws.
Thereafter, the Department, without notice to plaintiffs, changed its position on the component parts exemption for riverboat equipment. A January 1994 memorandum from Roe to McShane contained a position statement that the component parts exemption, as to gaming riverboats, would not encompass "[p]urchases of freestanding equipment (anything not secured to the deck), consumable supplies as well as silverware, barware, glassware and dishes, linens, cookware, serving trays, and similar property which is not related directly to gambling and which is not a structural component of the vessel. ..." (emphasis added).[2]
In early 1995, the Department audited plaintiffs' operations for 1993 and 1994. *557 In May 1995, almost a year after the Department adopted its ultimate position and two years after the August 1993 task force meeting attended by plaintiffs, the Department issued to plaintiffs a Notice of Proposed Assessment of sales and use tax, plus interest, on the gaming equipment and other property. Undisputedly, this was the first notice plaintiffs received of the Department's change in its original position.
After plaintiffs protested the denial of the exemption and the Department maintained its position, plaintiffs paid under protest the sum of $278,628.12, representing the sales and use taxes associated with the gaming equipment and interest thereon through the date of payment. This action followed to recover the amount paid under protest.

Proceedings in Lower Courts
After trial on the merits, the trial court concluded that the gaming equipment did not qualify as component parts of the vessel under La.Rev.Stat. 47:305.1A. However, the court ruled that the Department was equitably estopped from collecting the tax. Although the court acknowledged the only real harm occasioned by plaintiffs was the payment of interest, the court concluded that La.Rev.Stat. 47:1601 was a mandatory "all-or-nothing" statute that inseparably linked interest and taxes.[3] The court thus ordered the Department to refund to plaintiffs both the taxes and the interest paid under protest.
On the Department's appeal, the intermediate court, using a judicially-adopted heightened standard for determining applicability of equitable estoppel in cases involving a state entity, concluded that the doctrine applied in this case. 98-2882 (La.App. 1st Cir.2/18/00), 752 So.2d 390. The court also acknowledged that the 1985 codification of detrimental reliance in La. Civ.Code art. 1967 limits the remedy to the *558 harm incurred and that interest was the only harm plaintiffs incurred. Nevertheless, the court agreed with the trial court's interpretation of La.Rev.Stat. 47:1601 and concluded that both taxes and interest are always due, or not due, together, and that since interest cannot be collected, taxes also cannot be collected. Accordingly, the court held that "the trial court's assessment is correct in that the interest and the tax must be levied together or not at all." 98-2882 at p. 8, 752 So.2d at 395. The dissenting judge disagreed with the majority's reasoning on the latter point and would have limited plaintiffs' recovery to the interest incurred.
On the Department's application, we granted certiorari. 00-1227 (La.6/16/00), 763 So.2d 612.

Component Parts Exemption
The sole dispute is whether the items of gaming equipment, acquired by plaintiffs to outfit the vessel for riverboat gaming operations, qualifies as component parts of the vessel under La.Rev.Stat. 47:305.1A. This statute provides an exemption from sales tax for "sales of materials, equipment, and machinery which enter into and become component parts of ships, vessels, or barges." (emphasis added). The statute, however, does not define "component parts."
Because component parts are not defined in the exemption statute, plaintiffs contend that the courts should apply La. Civ.Code art. 11, which mandates that words should be given their generally prevailing meaning. Plaintiffs argue that, in the absence of a statutory definition, component parts of vessels should be defined by reference to the codal definition of a component part of a building or other structure set forth in La.Civ.Code art. 466.
Article 466, pertaining to component parts of immovables, arguably is susceptible of application to some movables by analogy. See 2 A.N. Yiannopoulos, Louisiana Civil Law Treatise: Property § 32 (1991). Article 466 provides:

Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.

Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached. (emphasis added).
The judicial interpretations of Article 466 have not been consistent, but the courts generally have applied a societal expectations analysis.[4] In the present case, plaintiffs, invoking the societal expectations *559 analysis, argue that the gaming equipment, like the chandeliers in Equibank (discussed in footnote 4), is something one would reasonably expect to see when they enter a gaming riverboat. Relying on that analysis, plaintiffs argue that the ability to remove the slot machines without damage to them or the vessel is irrelevant.[5]
Even under the societal expectation analysis, plaintiffs' argument is flawed. The pertinent sales tax exemption was designed to protect the shipyard industry, not the gaming industry.[6] When the analysis is properly focused on the shipyard industry, the relevant inquiry is not whether society expects to see gaming equipment when it enters a riverboat operated for gaming purposes, but whether society expects to see such equipment when it enters a vessel.[7] Significantly, the shipyard construction contract involving the vessel at issue did not mention gaming *560 equipment. Moreover, gaming equipment is customarily moved around the vessel to keep customer interest. Finally, under the customs and practices of the shipyard industry developed in this record, shipbuilding contracts do not include such equipment.[8] We therefore conclude that the average prudent business entity buying a vessel would not expect, in the absence of specific contractual provisions to the contrary, gaming equipment to be permanently attached to the vessel when the buyer took possession. See Coulter v. Texaco, Inc., 117 F.3d 909, 916 (5th Cir.1997)(using this type of analysis to conclude drilling rig was not component part of platform).
The trial court in the present case expressed similar reasons, stating:
[T]he statute was enacted to aid the ship building industry in Louisiana and not put it at a disadvantage with regard to neighboring states and thereby exempt sales tax on vessels and component parts to those vessels. Obviously, at the time that statute was enacted, the gaming industry was not even envisioned by the Legislature.... But I find that slot machines, the stands, the roulette wheels, the signs, and the surveillance system are not component parts of the vessel. It is not what this statute was intended to protect.
Moreover, as to the permanent attachment standard of the second paragraph of Article 466, the Department's expert marine surveyor identified four reasons why the gaming equipment would not qualify for the exemption:
The gaming equipment is not a part of a traditional shipyard contract. It's not part of any of the contracts that I have reviewed for gaming vessels. Secondly, it'sthe equipment is not required for the navigation of the vessel. Thirdly, it's not permanently installed. And fourth, it can be and is regularly moved, rearranged, changed. (emphasis added).[9]
The expert noted that the slot machines are bolted down for security reasonsto prevent them from easily tilting over when the vessel is moving. The slot machines, however, are not permanently installed, and are connected to the electrical system in the same way one plugs a lamp at home into an electrical outlet. Removing the slot machines involves merely unplugging the power cord, undoing three or four bolts, and lifting the machine. Finally, he observed that the slot machines can be and are regularly moved to maintain customer interest.
As to the cabinets on which the slot machines are placed, the expert noted the primary purpose of the cabinet was to get the slot machines off the floor to patron level, with a secondary purpose to provide a means to bolt the slot machines to the vessel and to allow for rearrangement of the machines.
Tax exemptions, being an exceptional privilege, must be expressly and clearly conferred in plain terms, and accordingly are strictly construed against the taxpayer. McNamara v. Central Marine Serv., Inc., 507 So.2d 207, 208 (La.1987). This rule of strict construction, coupled with the policy reasons behind the exemption *561 at issue, lead us to conclude that the trial court did not err in concluding that plaintiffs failed to meet their burden of establishing the slot machines, cabinets, and roulette wheels were not component parts. The slot machines were not permanently installed, i.e., their removal would not result in damage to the vessel or to the equipment itself, and they in fact were rearranged often. The machines could be removed simply by unplugging and unbolting them. Thus, we find no merit to plaintiffs' argument that these items constitute component parts.
As to the remaining items, we remand to the trial court for a determination as to whether the signs and surveillance systems constitute component parts when individually analyzed and thus fall within the exemption, an issue the lower courts did not fully analyze.[10]

Detrimental Reliance or Judicial Estoppel
Judicial estoppel has been defined as "the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct." Morris v. Friedman, 94-2808, p. 8 (La.11/27/95), 663 So.2d 19, 25. This concept was codified in 1985 in La. Civ.Code art. 1967, which provides in part:
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable. (emphasis added).
The Department first argues that the doctrine of detrimental reliance cannot be invoked against the government.[11]
The view that estoppel does not apply in cases involving the government was a corollary to the doctrine of sovereign immunity. With the abolition of sovereign immunity came a trend to permit equitable estoppel to be invoked against the government in tax matters. See Michael A. Rosenhouse, Annotation, Estoppel of State or Local Government in Tax Matters, 21 A.L.R.4th 573, 1983 WL 190977 (1983)(collecting cases); Valencia Energy Co. v. Arizona Dep't of Revenue, 191 Ariz. 565, 959 P.2d 1256 (1998). This trend is reflected in the Louisiana appellate cases that have invoked detrimental reliance in tax matters.[12]
*562 The court of appeal in the present case listed four factors required to support the "somewhat greater burden" for invoking equitable estoppel or detrimental reliance against a governmental agency. 98-2882 at p. 7, 752 So.2d at 394. See also Gulf States Utilities Co. v. Louisiana Pub. Serv. Comm'n, 92-1185 pp. 27-28 (La.3/17/94), 633 So.2d 1258, 1266 (Dennis, J., concurring). Applying that heightened four-prong test to the facts, the court of appeal reasoned:
[T]he first element is unequivocal advice from an unusually authoritative source. Millet and McShane were members of the Task Force. Both were appointed by the Secretary of the Department to work on the Task Force. Millet was the regional tax director of one of the regional offices. Both Millet and McShane testified that they were the persons who told plaintiff that this equipment was exempt from taxes under the statute. Based on these facts, this would be considered as unequivocal advice from an unusually authoritative source.
The next element is reasonable reliance on that advice by an individual. After being told the equipment was exempt from taxes, plaintiff was given tax exemption forms by Millet and McShane and were [sic] told to give them to vendors when purchasing the equipment. Therefore, plaintiff reasonably relied on that advice from Millet and McShane. Next, extreme harm must result from that reliance. Plaintiff was not informed of a change in policy that occurred one year later. Plaintiff was made knowledgeable of the change after it was audited and was assessed with interest. Being assessed with interest years later is extreme harm.
Finally, gross injustice must occur in the absence of judicial estoppel. Absent judicial estoppel, plaintiff would be required to pay taxes and interest on items it was explicitly told were exempt. One year later, after the department revisited the matter, the policy was changed, but the information was not disseminated. Yet, after it was audited and assessed taxes and interest, plaintiff was finally notified of a change in policy, which resulted in gross injustice. The final element is met.
98-2882 at pp. 7-8, 752 So.2d at 394. Based on the above analysis, the court concluded that the facts presented satisfied *563 not only the prior jurisprudential requisites for detrimental reliance, but also the statutory requirements set forth in La.Civ.Code art. 1967.
We disagree that extreme harm resulted from the reliance in the present case and that gross injustice will occur in the absence of the application of judicial estoppel. Detriment resulting from reliance simply has not been proved.
In reliance on advice from the Department's representatives, plaintiffs acquired the equipment without paying the taxes. Plaintiffs were harmed in that they could have paid the taxes under protest and sought recovery in court without being charged interest. The only harm to plaintiffs, as the lower courts correctly concluded, was payment of the interest incurred when they failed to pay timely under protest.[13]
As to detriment suffered from incurring non-punitive interest on account of failure to pay lawful taxes when due, the Arizona Supreme Court in Valencia Energy Co. v. Arizona Dep't of Revenue, 191 Ariz. 565, 959 P.2d 1256 (1998), reasoned:
[N]o detriment is incurred when the party's only injury is that it must pay taxes legitimately owed under the correct interpretation of the law. Nor will liability for non-punitive interest on the tax legitimately due constitute detrimental reliance. Non-punitive interest is, after all, nothing more than compensation for the use of money. The taxpayer had the benefit of using the funds before paying the tax claim and, in the legal sense, suffers no loss by reason of paying interest on the money it retained in its possession.
959 P.2d at 1268-69 (citations omitted).
We are substantially in accord with the Valencia reasoning. Interest, when incurred other than as a penalty, is defined as the damages due for the delay in performance of an obligation to pay money. See La.Civ.Code art. 2000. Plaintiffs were obligated to pay the Department the amount of the sales taxes due in 1993 and 1994. Plaintiffs did not pay the taxes timely, and interest was due as damages caused by this failure. Moreover, although plaintiffs may have had a good reason for not paying the taxes timely, the effect of the non-payment was that plaintiffs either (1) retained the money they should have paid as taxes and used that money in their business operations or earned interest on it, or (2) were not required to borrow money (at interest) to pay the taxes when due. In either event, the incurring of interest because of untimely payment of the debt was not shown by this record to be a detriment.[14]

Decree
For the foregoing reasons, the judgment of the court of appeal is reversed, and plaintiffs' action seeking a refund of taxes and interest paid under protest is dismissed, except as to the taxes and interest attributable to the signs and surveillance equipment. The case is remanded to the trial court to allow plaintiffs to present evidence on their entitlement to an exemption *564 for some or all of the signs and security surveillance equipment, if such equipment is found to be a component part, and for rendition of a judgment in accordance with this opinion.
Rehearing Denied.
LEMMON, J., dissenting in part from the denial of rehearing.
On original hearing, we completely denied plaintiffs recovery of interest on the basis that plaintiffs suffered no detriment because payment of non-punitive interest on money retained by the taxpayer is payment for use of the money.
Interest imposed under La.Rev.Stat. 47:1601 at the rate of one-and-one half percent per month is punitive interest. Therefore, plaintiffs were harmed by their reliance on the Department's advice to the extent of having to pay interest in excess of the rate at which plaintiffs could have borrowed money to pay the taxes when due. Accordingly, plaintiffs should be allowed to recover that part of the interest paid under protest in excess of the prevailing rate of interest at that time.
NOTES
[1] For purposes of the trial in this matter, the parties entered into a joint stipulation of nineteen uncontested facts. This stipulation covers virtually all the relevant factual matters in this case.
[2] Later in January 1994, the tax attorney for the Legal Division directed a memorandum to the director of the Sales Tax Division, stating:

[T]he intent of this statute [establishing the component part exemption] was to promote the ship building industry in Louisiana and relieve ship builders of inordinate tax burdens as they compete with other shipbuilding states. This statute also appears to apply only to the original construction of the ship itself. This exemption should not and, in the opinion of the Legal Division, does not apply to those items which are added or attached to the ship or vessel after its been constructed. Thus, these items should not be exempted under LSA-R.S. 47:305.1(A). Additionally, the Mississippi Department of Revenue and Taxation has a statute identical to LSAR.S. 47:305.1(A) and they hold that their gambling machines, materials and supplies are purchased in addition to the basic "ship or barge" itself, are not exempt from Mississippi Sales Tax. (emphasis added).
The Department's official policy position on the issue was stated in a March 1994 memorandum to Regional Directors and Area Audit Managers, as follows:
The construction and sale of those riverboat gaming vessels and dockside gaming vessels which are of over 50 tons load displacement, and which are sold by the builders, will not be subject to the sales or use tax on the vessel structure itself, as provided for by Revised Statute 47:305.1(A). The sales or use tax will he due on the original and replacement equipment which are placed on the vessels for the vessels' outfitting and operation. Taxable property will include, but not be limited to, slot machines, gaming tables, seating, barware, cookware, as well as the full range of expendable tangible personal property used in the operation of the vessels and in serving their patrons. (emphasis added).
In May 1995, the Department also published its policy position in its monthly newsletter, Tax Topics, as follows:
The sales tax statutes do not distinguish vessels that are used for gaming from other types of vessels. The construction and sale of those riverboat and dockside gaming vessels that are over 50 tons load displacement, and that are sold by the builders, will not be subject to the sales or use tax on the vessel structures themselves, as provided for by R.S. 47:305.1(A). The sales or use tax will be due on the original and replacement equipment that are placed on the vessels for the vessels' outfitting and operation. Taxable property will include, but not be limited to, slot machines, gaming tables, seating, barware, cookware, as well as the full range of expendable tangible personal property used in the operation of the vessels and in serving their patrons.
Louisiana Tax Topics, Vol. 15, No. 3 (May 1995)(emphasis added).
[3] La.Rev.Stat. 47:1601 provides:

A. When any taxpayer fails to pay a tax, or any portion thereof, on or before the day where it is required to be paid under the provisions of this Subtitle, interest at the rate of one and one-quarter percent per month shall be added to the amount of tax due and such interest shall be computed from the due date until the tax is paid.... The interest provided for herein shall be an obligation to be collected and accounted for in the same manner as if it were a part of the tax due and can be enforced in a separate action or in the same action for collection of the tax and shall not be waived or remitted. (emphasis added).
[4] The relevance of considering the community's view in determining the scope of the subcategories enumerated in the first paragraph of La.Civ.Code art. 466 was first recognized judicially in Lafleur v. Foret, 213 So.2d 141 (La.App. 3d Cir.1968). The court stated that "the proper standard to apply in the case here (where the parties have not specified their subjective intent on the matter) is a determination of whether the non-enumerated item, is, according to contemporary objective standards, a component of the immovable." 213 So.2d at 148. Under that test, the court looks to "(i) contemporary views as to conceptions of components in light of current house construction practices, and (ii) the degree of connection or attachment to the building." Id. Different factual contexts may also warrant additional considerations. Id.

The federal court in Equibank v. United States Internal Revenue Service, 749 F.2d 1176 (5th Cir.1985), citing Lafleur and relying upon the expert testimony presented in the district court by Professor A.N. Yiannopoulos regarding the disjunctive nature of Article 466, relied on societal expectations to resolve a dispute over the classification of costly chandeliers. The issue in Equibank was whether the chandeliers were component parts of the taxpayer's mansion in which they were installed and thus immovables and subject to the lender's mortgage, or movables subject to a federal tax lien. Since the chandeliers were in fact removed without substantial damage to them or to the house to which they were attached, they could not be considered component parts under the second paragraph of Article 466. Turning to the first paragraph, the court found the most likely enumerated subcategory into which the chandeliers could be grouped was electrical installations. In classifying the chandeliers as immovable, the court posed the "near-rhetorical question":
Does the average, ordinary, prudent person buying a home expect the light fixtures to be there when he or she arrives to take possession? Does that person expect the room to become illuminated when the light switch is thrown or should that person reasonably expect no response to the switch and, upon looking up, reasonably expect to see only a hole in the ceiling with the interior house wiring sticking out of the electrical workbox? In our view, the societal expectation is to have the lights go on.
749 F.2d at 1180. The court also relied on the degree of electrical skill required to disconnect the chandelier, contrasting things requiring permanent connection to the building's interior wiring system with things that are simply plugged into electrical sockets. The former were categorized as electrical installations, while the latter were not.
The reasoning in Lafleur and Equibank, regarding the relevance of societal expectations and the disjunctive nature of the two paragraphs of Article 466, was generally followed by the Louisiana state and federal courts. However, the federal court in Prytania Park Hotel, Ltd. v. General Star Indem. Co., 179 F.3d 169 (5th Cir.1999) questioned the reasoning of the Equibank decision, and held that "the test in every case is whether removal damage is `substantial'; it can never begin with a `societal expectations' test that disregards removal damage altogether." 179 F.3d at 183 n. 37. The court also noted that "[c]ourts cannot ignore differences in context, such as the nature of the installation and the nature of the building or structure ... when testing whether removal damage is substantial." Id. Nevertheless, the origin of the societal expectations test was not in the federal Equibank case, but in Lafleur, a state appellate decision.
[5] In any event, plaintiffs note it takes at least two men and Coast Guard approval to move the slot machines. Plaintiffs also note that when the gaming equipment was initially installed on the vessel, concrete had to be pumped into the hull to ballast the vessel. Thus, plaintiffs argue that even if structural damage upon removal is required for component part status, that test is met because these items were designed to be permanent additions to the vessel.
[6] A legislative purpose articulated for enacting this exemption was to protect the Louisiana shipbuilding industry since "without it, they would have been placed at a competitive disadvantage with their neighbors in adjoining states, where either no sales tax existed, or statutory exemption was afforded." Charles D. Marshall, Louisiana Sales and Use Tax Problems of the Maritime Operator, 35 Tul.L.Rev. 183, 184 (1960).
[7] Under that focus, the Department's expert's comment regarding navigability is relevant. As to navigation, he explained he meant that gaming equipment is not a component part because it is not needed on board either for Coast Guard approval or for operating the ship from point A to point B.
[8] The Department's expert testified that of the dozen or more shipyard contracts for riverboat gaming vessels he had reviewed, including the one between plaintiffs and their builder, none of them included the gaming equipment as a part of the construction contract.
[9] The expert's first two factors were addressed above in connection with the societal expectations test.
[10] The purchase price of the slot machines alone was almost $4,000,000, out of the total price for all "gaming equipment" of less than $5,000,000. As to the other items, the Department's expert conceded in his trial testimony that at least two of these other items, signs and the surveillance equipment, could be considered, in part, to be component parts. The expert viewed the signs and surveillance systems as separate from the gaming equipment, and characterized these items as presenting "mixed bags"some of each category were component parts and some were not. Those signs and surveillance systems he considered to be component parts were attached electrically so that they were not easily moved and were thus part of the vessel. This distinction was not addressed below.
[11] Because of our ultimate conclusion that detrimental reliance and judicial estoppel are inapplicable in this case, we pretermit the constitutional issues raised by the Department against the use of detrimental reliance.
[12] The Louisiana jurisprudence applying estoppel to tax matters has been described as running a spectrum. At one extreme, estoppel has not been applied when the tax statutes are clear and unambiguous; at the other, when the Department abruptly departs from established precedent, estoppel has been applied. A treatise on Louisiana sales and use taxes summarizes this spectrum as follows:

There are instances where a taxpayer obtains incorrect written or oral advice from the Department, and then acting in reliance upon that advice fails to collect a tax which is due. Is the Department thereafter be [sic] estopped from recovering that tax from the taxpayer when met with a defense of detrimental reliance? If the statutes imposing the tax are clear and unambiguous, the taxpayer will not be relieved of the liability for taxes not collected due to reliance on the Department's erroneous advice. Nevertheless, a taxpayer may be relieved of any penalties associated with such tax liabilities, provided that he has acted in good faith or without an intent to avoid payment of a tax known to be due.
A sharp distinction must be drawn between the Department's erroneous advice with respect to clear and unambiguous statutes and the taxpayer's right to force the Department to act in an administratively consistent manner. In instances where a statute is not clear or where the Department has adopted regulations or administrative policies regarding the scope and application of a tax statute, the taxpayer may rely on such an interpretative position and the Department will be bound to act with administrative consistency.
Bruce Oreck, Louisiana Sales & Use Taxation § 6.16 (2d ed. 1996). This case arguably falls in the middle of that spectrum.
[13] While plaintiffs argue that they suffered additional harm in that they made business decisions regarding hiring of additional employees and making additional expenditures based on their reliance on the representation that the taxes were not due, the record does not support this argument.
[14] Our conclusion that plaintiffs' being required to pay non-punitive interest is not "harm" for purposes of detrimental reliance allows us to pretermit the statutory issue of whether interest can be separated from the underlying tax under La.Rev.Stat. 47:1601, i.e., whether that statute created an "all-ornothing" proposition, inasmuch as plaintiffs owed both taxes and interest.