HUGHES, J.
BWe granted certiorari in this case to review an appellate court reversal of a district court ruling that the defendants, a medical diagnostic monitoring company and its employee/physician, were not “qualified health care providers” (“QHCPs”) under the Louisiana Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq. (“MMA”), for purposes of alleged acts of medical malpractice. For the reasons that follow, we reverse the appellate court, reinstate the district court judgment, and remand.
FACTS AND PROCEDURAL HISTORY
On October 30th and November 1st of 2007, George Luther underwent two successive surgical procedures on his back at a Monroe hospital, which resulted in neurological damage, including partial paralysis. During the October surgery, Intra-Op Monitoring Services, LLC (“Intra-Op”) provided electro-diagnostic monitoring services to the operating surgeon, by means of an on-site technician (John Partridge) and remote monitoring by Dr. Dan W. Joachim, who was located in Intra-Op’s Covington office. Allegedly, Dr. Joachim and Mr. Partridge 12negligently failed to apprise Mr. Luther’s surgeon, during the October surgery, of “significant loss of function to critical neurological structures,” reporting, instead, functioning within normal limits. The incorrect monitoring reports purportedly deprived the surgeon of the opportunity to take appropriate action, which could have prevented the permanent loss of motor function that Mr. Luther suffered.[1]
Subsequent to these events, Intra-Op was purchased by IOM Company, LLC *820 (“IOM”), in September of 2008. In October of 2008, Mr. Luther requested a medical review panel to evaluate the asserted medical malpractice of his surgeon and the hospital.[2] This request was later amended, in June of 2009, to assert the negligence of IOM, its employees, and medical staff, particularly Dr. Joachim and Mr. Partridge, for their failure to notify Mr. Luther’s surgeon of “salient medical facts which would or could have altered the surgical result of 80 October 2007.”
On July 7, 2009, the Louisiana Patient’s Compensation Fund (“PCF”) forwarded a letter to Mr. Luther’s attorney, stating that “[b]ased on the documents and information in possession of this office as of this date, ... [Intra-Op and Dr. Joachim] are being reported as qualified for acts of medical malpractice under the provisions of [the MMA], for the above referenced claim.” The PCF letter further stated that “[t]he Oversight Board reserves the right to revise its qualification and coverage determination upon receipt of additional information.”
Subsequently, on or about August 11, 2010, Mr. Luther and IOM agreed to settle the matter, with IOM agreeing to pay $100,000 to Mr. Luther in exchange for a release of liability, subject to court approval; Mr. Luther would retain the right to proceed against the PCF. In connection with the petition for approval of the settlement agreement, filed with the 4th Judicial District Court, the Patient’s | sCompensation Fund Oversight Board (“Board”) was served with the petition and given formal notice of the terms of the settlement agreement. Thereafter, the PCF staff reviewed its earlier letter that the defendants were qualified for acts of medical malpractice under the MMA, for Mr. Luther’s claim, and discovered that, at the time of Mr. Luther’s October 2007 surgery, the defendants were not QHCPs under the provisions of the MMA.[3] On August 17, 2010, the PCF notified Mr. Luther’s attorney that its July 7, 2009 letter “incorrectly listed [Intra-Op and Dr. Joachim] as qualified health care providers for the referenced [Medical Review Panel].” The August 17, 2010 PCF letter further stated that “our records reflect that [Intra-Op and Dr. Joachim] are considered not qualified for the acts of medical malpractice under the [MMA].” (Emphasis original.) Letters were also sent on August 17, 2010 to Intra-Op .and Dr. Joa-chim, by the PCF, advising them that the PCF records reflected that they were not members of the fund and were not qualified for panel review, for purposes of Mr. Luther’s claim.
On October 15, 2010, Mr. Luther and his wife filed suit against IOM, Dr. Joachim, Mr. Partridge,[4] and Admiral Insurance Company (IOM’s liability insurer), seeking damages arising out of alleged acts of neg *821 ligence during Mr. Luther’s October 30, 2007 surgery. IOM and Dr. Joachim filed a third party demand against the PCF and the Board for a declaration by the court that they were QHCPs under the MMA. Thereafter, the PCF and the Board filed a motion for summary judgment, contending that because the defendants had not enrolled with the PCF prior to the date of the alleged tort in this case, but, rather, enrolled after |4the date of Mr. Luther’s October 30, 2007 surgery, they were not QHCPs with respect to the alleged October 30, 2007 malpractice. The defendants responded with a cross motion for summary judgment, asserting that they detrimentally relied on the PCF’s July 7, 2009 letter stating they were QHCPs, and the PCF should be estopped from revoking that “certification.” The district court denied the defendants’ motion for summary judgment and granted the PCF’s motion for summary judgment, finding that the defendants were not QHCPs; the defendants’ third party demand was dismissed.
The defendants then sought review from the appellate court, which reversed the district court’s grant of summary judgment in favor of the PCF and rendered summary judgment in favor of the defendants, prohibiting the PCF from withdrawing its certification that the defendants were QHCPs for this claim. In so ruling, the appellate court reasoned that the defendants “were certified by the PCF as QHCPs” and that the defendants “relied upon this certification in entering into a settlement with the plaintiffs.” See Luther v. IOM Company LLC, 47,667 (La. App. 2 Cir. 1/16/13), 109 So.3d 467. Thereafter, this court granted the PCF’s application for review. See Luther v. IOM Company LLC, 2013-0353 (La.4/19/13), 111 So.3d 1022.
The PCF presents the following assignments of error to this court for review: (1) the appellate court improperly considered the PCF as the defendants’ insurer; (2) the appellate court improperly and erroneously interpreted critical and significant PCF rules and regulations establishing requirements for qualified healthcare provider status for a particular malpractice claim; (3) the appellate court made erroneous factual findings that all conditions and requirements of the PCF’s rules and regulations regarding enrollment were satisfied on October 30, 2007, when there was no evidence to support such a finding; (4) the appellate court improperly applied LSA-C.C. art. 1967 and/or the doctrine of equitable estoppel | Bunder the facts at bar, as there was no evidence that the defendants were reasonable in relying upon representations or were harmed; (5) the appellate court improperly found that the defendants met their burden of establishing a LSA-C.C. art. 1967 and/or equitable estop-pel claim against the PCF; and (6) the appellate court’s application of LSA-C.C. art. 1967 and/or equitable estoppel in these circumstances impermissibly resulted in de facto amendments of the PCF’s rules and regulations, properly and duly enacted pursuant to Louisiana Legislation.
LAW AND ANALYSIS

Motion for Summary Judgment

Appellate courts review summary judgments de novo under the same criteria that govern a district court’s consideration of whether summary judgment is appropriate. Greemon v. City of Bossier City, 2010-2828 (La.7/1/11), 65 So.3d 1263, 1267; Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880, 882; Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Authority, 2002-1072 (La.4/9/03), 842 So.2d 373, 377. In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or to determine the *822 truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party’s favor. Hines v. Garrett, 2004-0806 (La.6/25/04), 876 So.2d 764, 765. A fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id. at 765-66.
On motion for summary judgment, the burden of proof remains with the movant. However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or 16more elements essential to the adverse party’s claim, action, or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. See LSA-C.C.P. art. 966(C)(2). See also Schultz v. Guoth, 2010-0343 (La.1/19/11), 57 So.3d 1002, 1006.
When a motion for summary judgment is made and supported as provided in LSA-C.C.P. art. 967, an adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in LSA-C.C.P. art. 967, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967(B). See also Dejoie v. Medley, 2008-2223 (La.5/5/09), 9 So.3d 826, 832.
Whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Richard v. Hall, 2003-1488 (La.4/23/04), 874 So.2d 131, 137.

Medical Malpractice Act

The legislature enacted the MMA in 1975 in response to a perceived medical malpractice insurance crisis. The legislature intended the MMA to reduce or stabilize medical malpractice insurance rates and to assure the availability of affordable medical services to the public. To achieve those goals, the MMA gives qualified health care providers two substantial advantages in actions against them for malpractice: (1) a limit on the amount of damages recoverable, and (2) the requirement that the claim first be reviewed by a medical review panel before commencing suit in a court of law. Williamson v. Hospital Service District No. 1 of Jefferson, 2004-0451 (La.12/1/04), 888 So.2d 782, 785-86. Because the MMA limits the liability of health care providers in derogation of the general rights |7of tort victims, any ambiguities in the MMA should be strictly construed against coverage. Richard v. Louisiana Extended Care Centers, Inc., 2002-0978 (La.1/14/03), 835 So.2d 460, 468.
The MMA sets forth the method for becoming a QHCP and the benefits thereof in LSA-R.S. 40:1299.42, which in 2007[5] provided:
A. To be qualified under the provisions of this Part, a health care provider shall:
*823 (1) Cause to be filed with the board proof of financial responsibility as provided by Subsection E of this Section.
(2) Pay the surcharge assessed by this Part on all health care providers according to R.S. 40:1299.44.
(8) For self-insureds, qualification shall be effective upon acceptance of proof of financial responsibility by and payment of the surcharge to the board. Qualification shall be effective for all others at the time the malpractice insurer accepts payment of the surcharge.
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.48, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
(3)(a) Any amount due from a judgment or settlement or from a final award in an arbitration proceeding which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient’s compensation fund pursuant to the provisions of R.S. 40:1299.44(0.
(b) The total amounts paid in accordance with Paragraphs (2) and (3) of this Subsection shall not exceed the limitation as provided in Paragraph (1) of this Subsection.
C. Except as provided in R.S. 40:1299.44(0, any advance payment made by the defendant health care provider or his insurer to or for the plaintiff, or any other person, may not be construed as an admission of liability for injuries or damages suffered by the plaintiff or anyone else in an action brought for medical malpractice.
IrD. (1) Evidence of an advance payment is not admissible until there is a final judgment in favor of the plaintiff, in which event the court shall reduce the judgment to the plaintiff to the extent of the advance payment.
(2) The advance payment shall inure to the exclusive benefit of the defendant or his insurer making the payment.
(3) In the event the advance payment exceeds the liability of the defendant or the insurer making it, the court shall order any adjustment necessary to equalize the amount which each defendant is obligated to pay, exclusive of costs.
(4) In no ease shall an advance payment in excess of an award be repayable by the person receiving it.
(5) In the event that a partial settlement is executed between the defendant and/or his insurer with a plaintiff for the sum of one hundred thousand dollars or less, written notice of such settlement shall be sent to the board. Such settlement shall not bar the continuation of the action against the patient’s compensation fund for excess sums in which event the court shall reduce any judgment to the plaintiff in the amount of malpractice liability insurance in force as provided for in R.S. 40:1299.42(B)(2).
E. (1) Financial responsibility of a health care provider under this Section may be established only by filing with the board proof that the health care provider is insured by a policy of malpractice liability insurance in the amount of at least one hundred thousand dollars per claim with qualification under this Section taking effect and following the same form as the policy of malpractice *824 liability insurance of the health care provider, or in the event the health care provider is self-insured, proof of financial responsibility by depositing with the board one hundred twenty-five thousand dollars in money or represented by irrevocable letters of credit, federally insured certificates of deposit, bonds, securities, cash values of insurance, or any other security approved by the board. In the event any portion of said amount is seized pursuant to the judicial process, the self-insured health care provider shall have five days to deposit with the board the amounts so seized. The health care provider’s failure to timely post said amounts with the board shall terminate his enrollment in the Patient’s Compensation Fund.
(2) For the purposes of this Subsection, any group of self-insured health care providers organized to and actually practicing together or otherwise related by ownership, whether as a partnership, professional corporation or otherwise, shall be deemed a single health care provider and shall not be required to post more than one deposit. In the event any portion of the deposit of such a group is seized pursuant to judicial process, such group shall have five days to deposit with the board the amounts so seized. The group’s failure to timely post said amounts with the board will terminate its enrollment and the enrollment of its members in the Patient’s Compensation Fund.
|9There are two prongs to the test of whether a health care provider is qualified under the MMA: (1) whether proof of financial responsibility has been filed with the PCF (pursuant to LSA-R.S. 40:1299.42(A)(1) and 40:1299.42(E)) and (2) whether the surcharge has been paid (pursuant to LSA-R.S. 40:1299.42(A)(2)), which is necessary to provide monies for the fund (as stated in LSA-R.S. 40:1299.44(A)(2)(a)). In addition, in accordance with LSA-R.S. 40:1299.41(A)(10), a health care provider must be licensed or certified by this state to provide health care or professional services and, if a physician, he must possess an unlimited license to practice medicine in this state. See O’Brien v. Rizvi, 2004-2252 (La.4/12/05), 898 So.2d 360, 365.
Subsection (E) of LSA-R.S. 40:1299.42 describes the methods by which a health care provider may establish proof of financial responsibility (by filing with the Board proof that the provider is insured by a policy of malpractice liability insurance meeting the specifications set forth in Subsection E), and LSA-R.S. 40:1299.42(A)(3) governs when a health care provider’s qualification under the MMA becomes effective (when proof of financial responsibility has been filed and the assessed surcharge paid by the provider). Abate v. Healthcare International, Inc., 560 So.2d 812, 820 (La.1990). The MMA does not provide coverage to health care providers who fail to qualify prior to the commission of tortious conduct. Id. at 813.
In this case, the PCF’s motion for summary judgment pointed to the fact that the defendants had not enrolled with the fund at the time of the alleged malpractice and therefore could not be QHCPs under MMA. In support of this contention, the PCF submitted the affidavit and deposition of PCF Surcharge Section Supervisor Susan Gremillion, who verified that PCF records showed no enrollment by the defendants, in 2007, until November 16, 2007. Ms. Gremillion also indicated that, | 10due to a malfunction associated with newly installed computer software, on July 7, 2009, a PCF letter was generated and sent out, which reported that the .defendants were QHCPs with respect to the alleged medical *825 malpractice committed upon Mr. Luther on October 30, 2007. Ms. Gremillion further testified that when the 2010 proposed settlement agreement was presented to the PCF, the error was discovered and corrected correspondence was sent to the parties, which accurately reported that the defendants were not QHCPs with respect to the Luthers’ tort suit.
In the light of this evidence, which the defendants could not refute (IOM CEO Roderick Johnson testified in his deposition that he knew of no evidence in the company’s possession to show that IOM had applied for enrollment in the PCF prior to November 16, 2007), the defendants raised the doctrine of detrimental reliance, based on the PCF’s erroneous 2009 letter that they were QHCPs. The defendants asserted that their decision to enter into a settlement agreement with the plaintiffs was in reliance on their status as QHCPs, and if they had not been erroneously designated as QHCPs, their defense strategy would have been different.
Louisiana Civil Code Article 1967, entitled “Cause defined; detrimental reliance,” codifies the doctrine of detrimental reliance, providing:
Cause is the reason why a party obligates himself. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one’s detriment because of the 1 ^reliance. Suire v. Lafayette City-Parish Consolidated Government, 2004-1459 (La.4/12/05), 907 So.2d 37, 59. Estoppels are not favored in our law; therefore, a party cannot avail himself of that doctrine if he fails to prove all essential elements of the plea. See Wilkinson v. Wilkinson, 323 So.2d 120, 126 (La.1976).
It has been suggested that proving detrimental reliance against a governmental agency should be more burdensome, requiring: (1) unequivocal advice from an unusually authoritative source, (2) reasonable reliance on that advice by an individual, (3) extreme harm resulting from that reliance, and (4) gross injustice to the individual in the absence of judicial estoppel. See Showboat Star Partnership v. Slaughter, 2000-1227 (La.4/3/01), 789 So.2d 554, 563-64; CHL Enterprises, LLC v. State, Department of Revenue, 2009-487 (La.App. 3 Cir. 11/4/09), 23 So.3d 1000, 1005-06, writ denied, 2009-2613 (La.2/12/10), 27 So.3d 848; Showboat Star Partnership v. Slaughter, 98-2882 (La. App. 1 Cir. 2/18/00), 752 So.2d 390, reversed on other grounds, 2000-1227 (La.4/3/01), 789 So.2d 554; Eicher v. Louisiana State Police, Riverboat Gaming Enforcement Division, 97-0121 (La.App. 1 Cir. 2/20/98), 710 So.2d 799, 804, writ denied, 98-0780 (La.5/8/98), 719 So.2d 51. See also Gulf States Utilities Company v. Louisiana Public Service Commission, 92-1185 (La.3/17/94), 633 So.2d 1258, 1266 (Dennis, J., concurring); Red River Parish Port Commission v. Headwaters Resources Inc., 698 F.Supp.2d 684, 695 (W.D.La.2010). In this case, the Board is clearly a governmental “agency,” as de *826 fined by LSA-R.S. 49:951(2), meaning a state board, commission, department, agency, officer, or other entity which makes rules, regulations, or policy, or formulates, or issues decisions or orders, pursuant to, as directed by, or in implementation of the federal or Louisiana Constitution and/or laws, excepting the courts, the legislature or any branch, committee, or officer thereof, any political subdivision, and any board, commission, department, agency, officer, or other entity thereof.
| ^Regardless, the defendants have not shown that all of the elements of detrimental reliance are present in this case, even if the lesser standard were applied. Although the PCF made a representation that the defendants were QHCPs, it was not reasonable for the defendants to have relied on such a representation. The defendants admittedly knew that they had not enrolled with the PCF prior to the allegedly tortious conduct in this case. This court has previously held that a party having the means readily and conveniently available to determine the true facts, but who fails to do so, cannot claim estoppel. See Morris v. Friedman 94-2808 (La.11/27/95), 663 So.2d 19, 25. Although the ownership of the defendant corporation changed hands during the course of this proceeding, the defendants clearly had the means to ascertain from the corporate records whether they were in fact enrolled with the PCF at the time of the tortious conduct at issue, as they had obviously accomplished such a review of their records prior to CEO Johnson’s 2011 deposition.
Furthermore, equitable considerations and estoppel cannot be permitted to prevail when in conflict with the positive written law. Morris v. Friedman, 663 So.2d at 25-26 (quoting Palermo Land Company v. Planning Commission of Calcasieu Parish, 561 So.2d 482, 488 (La.1990)). As indicated hereinabove, a health care provider can only be qualified for participation in the PCF by filing with the Board proof of financial responsibility and paying the assessed surcharge, pursuant to LSA-R.S. 40:1299.42. In addition, PCF rules, promulgated in the Louisiana Administrative Code, require that any application for enrollment be made upon the forms prescribed and supplied by the PCF executive director.[6] See La. Admin. Code, Title 37, § 513. The only application on file with the PCF for the 1 ^defendants in 2007 was filed November 16, 2007 (more than two weeks after the tort); contained on the second page of that application was the following pre-printed notice, directed by the PCF to applicants:[7]
Your primary insurance policy provides CLAIMS MADE coverage for professional liability. Except to the extent as may otherwise be specifically provided in your policy, such primary coverage is limited to claims arising from medical incidents occurring on or after the initial effective date stated in the declarations (“retroactive date”) and first reported to *827 your company while the policy is in force. HOWEVER, THE PCF RETROACTIVE DATE IS THE DATE OF YOUR QUALIFICATION WITH THE FUND, WHICH MAY OR MAY NOT MATCH THE RETROACTIVE DATE ESTABLISHED ON YOUR PRIMARY POLICY. Claims occurring prior to the qualification date with the Fund, REGARDLESS OF THEIR COVERAGE THROUGH YOUR PRIMARY POLICY, are not covered by the Fund. [Emphasis original; boldface added.]
Further, in Part 3 of the defendants’ application, the defendants agreed that it had received the following notice:
I understand that, regardless of the retroactive date established by my primary policy, I will only receive coverage through the Fund for claims which occur after my qualification with the Fund. For a claim to be covered by the Patient’s Compensation Fund, I must have been qualified with the Fund both at the time the medical incident occurred, and at the time the claim was filed with my primary carrier. [Emphasis added.]
Not only were the defendants aware that they were not previously enrolled with the fund on the date that their November 16, 2007 PCF application was filed, but they were expressly advised by the statements contained on the application form that they would not have PCF coverage for any claims prior to November 16, 2007.
In support of its motion for summary judgment before the district court, the PCF established that the defendants were not enrolled or qualified for coverage with the fund until November 16, 2007, after the tortious conduct in this case occurred, on October 30, 2007. Therefore, it became the defendants’ burden to Improve otherwise. The defendants effectively conceded the fact that they were not QHCPs on October 30, 2007, and contended, instead, that the PCF should be estopped, under the doctrine of detrimental reliance, from taking a position contrary to its erroneous July 7, 2009 letter, reporting the defendants were QHCPs. However, the defendants failed to prove an essential element of that claim, i.e., that they reasonably relied on the PCF’s erroneous statement of fact. As stated hereinabove, to prevail on a motion for summary judgment, a party need only point out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial; if the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. See LSA-C.C.P. art. 966(C)(2); Schultz v. Guoth, 57 So.3d at 1006.
CONCLUSION
In the face of PCF evidence that the defendants either knew or had the means of easily discovering that they were not legally entitled to QHCP status for acts of malpractice occurring on October 30, 2007, the defendants’ claim of detrimental reliance is unsustainable. Consequently, we conclude that the district court was correct in ruling that the defendants were not QHCPs in this- case, in granting summary judgment to the PCF and in denying summary judgment to the defendants. The court of appeal erred in reversing the district court rulings and entering judgment in the defendants’ favor. Accordingly, the judgment of the court of appeal is reversed and vacated in all respects, and the rulings of the district court are reinstated. The case is remanded to the district court for further proceedings.
*828 |1fiDECREE
For the reasons assigned, we reverse and vacate the decision of the court of appeal and reinstate the district court judgment in favor of the Louisiana Patient’s Compensation Fund and against the defendants herein. We remand to the district court for further proceedings.
APPELLATE COURT JUDGMENT REVERSED AND VACATED; DISTRICT COURT JUDGMENT REINSTATED; REMANDED FOR FURTHER PROCEEDINGS.

. The second surgery on November 1, 2007 was to attempt to correct the migration of a “pedicle screw” placed during the October surgery and to "re-fix” the fusion.

. Neither Mr. Luther's surgeon nor the surgical hospital are involved in the instant litigation, and the use of "defendants” herein does not reference either the surgeon or the hospital.

. The September 20, 2010 affidavit of Susan Gremillion, an employee of the PCF, was filed into the record and stated, in part, that she had been supervisor of the PCF Surcharge Section since February 4, 2002, that she had reviewed the PCF records, that IOM had submitted an application for enrollment on November 16, 2007 (a copy of which was attached to the affidavit), and that in connection with that application a certificate of enrollment was issued on August 18, 2010, which showed that the first date of PCF coverage for IOM began on November 16, 2007.

.Multiple attempts were made to serve Mr. Partridge in Texas, under the Long Arm Statute, LSA-R.S. 13:3201 et seq., but all such letters were returned as undeliverable, and Mr. Partridge made no appearance in the suit.

. Unless otherwise noted, all law cited herein is to that version in effect at the time of the tortious conduct at issue herein, October 30, 2007.

. The Board has the authority, under LSA-R.S. 40:1299.44(D)(3), to adopt and promulgate such rules, regulations, and standards as it may deem necessary or advisable to implement the authority and discharge the responsibilities conferred and imposed on the board by the MMA, in accordance with applicable provisions of the Administrative Procedure Act, LSA-R. S. 49:950 et seq.

. The applicant was listed as Intra Op Monitoring Services, Inc., and Dr. Joachim was listed as a health care provider employed by the company. The enrollment date listed as being sought by Intra-Op was "November 16, 2007.” Also, Intra-Op listed on the application its primary insurer as Evanston Insurance Company, noting its policy with that insurer was a "claims-made” policy and had effective dates of May 1, 2007 through May 1, 2008.