ROBERT A. CHAISSON, Judge.
|sIn this suit for breach of contract and various tort claims based in fraud, Winifred B. Gilbert and Noel M. Gilbert (the “Gilberts”) appeal a summary judgment granted in favor of defendants, who are former business partners of the Gilberts, a corporation owned by the business partners, attorneys who represented the business partners regarding the business venture, the law firms of those attorneys, and the insurer of one of the law firms. Upon de novo review, for the following reasons, we affirm the grant of summary judgment in favor of all defendants.
FACTS AND PROCEDURAL HISTORY
In 1980, Dr. Warren Gottsegen and his then wife (the “Gottsegens”) became business partners with the Gilberts when the *292 Gottsegens purchased a one-half interest in a piece of commercial property, the other half of which was already downed by the Gilberts.[1] In 1983, the Gilberts and Gottsegens jointly refinanced the property with Pelican Homestead and Savings Association (“Pelican Homestead”). By 1986, after the loan had become delinquent, the Gilberts and Gottsegens entered into an agreement regarding the loan. It is this agreement that is the subject of the Gil-berts’ breach of contract claims. There is no dispute that, due to financial constraints on the Gilberts at that time,, the Gottse-gens agreed to bring the loan current and the Gilberts signed a promissory note in favor of the Gottsegens for the Gilberts’ share of the delinquent payments and for any future payments the Gottsegens would make on their behalf. The parties agreed that the Gilberts would repay the note to the Gottsegens out of their share of the sale of the property. The Gilberts contend that under the agreement, Dr. Gottsegen additionally obligated himself to sell the property and to pay both parties’ shares of all future loan payments until such time as the property was sold. Dr. Gottsegen disputes that he obligated himself to sell the property. He also contends that while the Gilberts were obligated to repay any future payments that he did make on then-behalf, he did not assume responsibility for, nor obligate himself to pay, the Gil-berts’ share of future loan payments.
Subsequent to the 1986 agreement, the Gottsegens continued to make payments on the loan until 1992, at which time they discontinued paying the note and the loan again went into default. In 1994, the then current holder of the note, National Information Services, Inc. (“NIS”)[2], brought suit for executory process, which resulted in the property being sold at sheriffs sale to NIS for an amount substantially less than it had appraised for in 1982.[3] Thereafter, NIS obtained a | .^deficiency judgment against the Gilberts and Gottsegens in an amount in excess of $454,000.[4] In 1999, attorney Mitchell J. Hoffman, acting on behalf of the Gottse-gens, negotiated a full settlement of the deficiency judgment with NIS in the amount of $450,000, which amount was paid by Dr. Gottsegen. Subsequent actions undertaken by Dr. Gottsegen and his attorneys to recover the Gilberts’ virile share of the deficiency judgment from them form the basis of the Gilberts’ tort claims based in fraud.
On or about October 6, 1999, Dr. Gottse-gen paid $450,000 in full settlement of the NIS deficiency judgment. On October 20, 1999, attorney Kermit L. Roux, III, acting on behalf of Dr. Gottsegen, filed into the NIS suit a Partial Motion to Dismiss, which contained a clause subrogating NIS’s deficiency judgment rights to Dr. Gottsegen. On September 20, 2000, Mr. Roux obtained from NIS an assignment of its deficiency judgment rights to Cardiovascular Surgery Associates, Inc. (“CSA”), a company solely owned by Dr. Gottsegen, effective as of October 11, 1999. Then, on October 4, 2000, Mr. Roux filed a Motion and Order to Substitute CSA as party plaintiff for NIS in the NIS suit. On *293 October 8, 2001, the Gilberts filed suit against Dr. Gottsegen alleging that he breached their 1986 agreement by “refusing to make the June 1, 1992 mortgage payment and subsequent payments to Pelican Homestead and Savings Association” and “[i]n failing to sell or attempt to sell the property as he had agreed to do.” Despite the fact that the Gilberts had a pending suit for damages against Dr. Gott-segen for an alleged breach of contract regarding their business venture, the Gil-berts, on December 20, 2001, subsequent to various collection efforts being undertaken by the Gottsegens and CSA, agreed to pay $80,000 to Dr. Gottsegen and CSA, payable at the rate of $800 per month, to settle their virile share of the NIS 1 ^deficiency judgment. The Gilberts eventually paid the $80,000 in full on May 25, 2008.
Between July 27, 2009, and May 9, 2011, almost eight years after the filing of their original suit, and after payment in full of the $80,000 settlement to Dr. Gottsegen and CSA, the Gilberts amended their original petition four times to make allegations of fraudulent conduct engaged in by Dr. Gottsegen, CSA, Mr. Hoffman and Mr. Roux.[5] In their amended petitions, the Gilberts alleged that in September of 1999, Mr. Hoffman, on behalf of Dr. Gottsegen, negotiated a full settlement of NIS’s January 16, 1998 deficiency judgment for the sum of $450,000, which amount was paid to NIS by Dr. Gottsegen on or shortly before October 6, 1999. They further alleged that the written compromise settlement agreement, which was not filed in the underlying court record, fully released all defendants in the deficiency proceeding, including the Gilberts. The thrust of the Gilberts’ fraud allegations is that all of the actions of Dr. Gottsegen and his attorneys to collect the Gilberts’ virile share of the deficiency judgment were engaged in fraudulently, their theory being that their obligations under the deficiency judgment had previously been extinguished by Dr. Gottsegen’s full compromise of that judgment with NIS. In particular, the Gilberts point to various documents prepared by Mr. Roux as fraudulent: 1) the October 20, 1999 Partial Motion to Dismiss, which contained a clause subrogating NIS’s deficiency judgment rights to Dr. Gottsegen; 2) the September 20, 2000 assignment by NIS of its deficiency judgment rights to CSA; and 3) the October 4, 2000 Motion and Order to Substitute CSA as party plaintiff for NIS.
|7A11 defendants filed Motions for Summary Judgment arguing that the Gilberts could not establish any genuine issues of material fact on either their breach of contract claim or their tort claims that would necessitate a trial. After a hearing, the trial court granted summary judgment in favor of all defendants. Upon de novo review, for the reasons that follow, we affirm the judgment of the trial court.
DISCUSSION
A summary judgment is appropriate when there remains no genuine issue as to material fact and the mover is entitled to judgment as a matter of law. Zeringue v. O’Brien Transp., Inc., 05-760 (La.App. 5 Cir. 4/11/06), 931 So.2d 377, 379, writ denied, 06-1107 (La.9/1/06), 936 So.2d 205. Summary judgments are favored in the law and the rules should be *294 liberally applied. Id. The summary judgment procedure shall be construed to accomplish the ends of just, speedy, and inexpensive determination of allowable actions. Id.
Appellate courts review a judgment granting a motion for summary judgment on a de novo basis. Gutierrez v. State Farm Fire & Cas. Ins. Co., 13-341 (La.App. 5 Cir. 10/30/13), 128 So.3d 509, 511. Thus, this Court uses the same criteria as the trial court in determining whether summary judgment is appropriate: whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. Id. A fact is material if it potentially ensures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. Luther v. IOM Co. LLC, 13-0353 (La.10/15/13), 130 So.3d 817, 822. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id.
IsProcedurally, the court’s first task on a motion for summary judgment is determining whether the moving party’s supporting documents — pleadings, depositions, answers to interrogatories, admissions and affidavits — are sufficient to resolve all material factual issues. Murphy v. L & L Marine Transp., Inc., 97-33 (La.App. 5 Cir. 5/28/97), 695 So.2d 1045, 1047 (citing La. C.C.P. art. 966(B)). .To satisfy this burden, the mover must meet a strict standard of showing that it is quite clear as to what is the truth and that there has been excluded any real doubt as to the existence of a genuine issue of material fact. Id. In making this determination, the mover’s supporting documents must be closely scrutinized and the non-mover’s indulgently treated. Id. Since the moving party bears the burden of proving the lack of a material issue of fact, inferences to be drawn from the underlying facts before the court must be viewed in light most favorable to the non-moving party. Id.
If the court determines that the moving party has met this onerous burden, the burden shifts to the non-moving party to present evidence demonstrating that material factual issues remain. Murphy, supra. Louisiana Code of Civil Procedure article 967 outlines the non-moving party’s burden of production as follows:
When a motion for summary judgment is made and supported ..., an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate', shall be rendered against him.
Summary judgment is appropriate when all the relevant facts are marshalled before the court, the marshalled facts are undisputed, and the only issue is the ultimate conclusion to be drawn from those facts. Id.
| ⅝Breach of Contract Claim
“Interpretation of a contract is the determination of the common intent of the parties.” La. C.C. art. 2045. “When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” La. C.C. art. 2046. “Generally, where the words of a contract are clear, explicit, and lead to no absurd consequences, the meaning and intent of the parties must be sought within the four comers of the document and cannot be explained or contradicted by parol evidence.” Successions of Pelicano v. *295 Shockley, 05-CA-495 c/w 05-CA-496 (La.App. 5 Cir. 12/27/05), 920 So.2d 248, 250.
In the present case, the Gilberts contend that the agreement between themselves and the Gottsegens is contained in correspondence dated April 28, 1986, from the Gottsegens’ then counsel, David R. Sherman, to Mr. Gilbert, and in the promissory note executed by the Gilberts on May 19, 1986. They maintain that Dr. Gottsegen affirmatively obligated himself to sell their jointly owned property, and further affirmatively obligated himself to pay the Gilberts’ portion of all future mortgage payments until such time as the property was sold.
Mr. Sherman’s letter indicates that it is intended to “reduce to writing the agreement which we reached during our telephone conversation on April 21, 1986,” and • sets forth that agreement as follows:
(1) You will execute a power of attorney ... authorizing [Dr. Gottsegen] to sell 145-151 Riverside Mall on his behalf and your behalf.
(2) [The Gottsegens] will make any mortgage payments currently due ... and bring the same up-to-date. You will execute a promissory note in favor of [the Gottsegens] for any portion of the mortgage payments which they make on your behalf.
(3) At the Act of Sale [the Gottsegens] will be repaid out of your share of the net sales proceeds (Emphasis added).
|inThe clear language of this agreement indicates that the Gottsegens only obligated themselves to make the mortgage payments that were currently due (as of the date of the letter) and to bring same up-to-date. There is no language in the agreement that can be interpreted to require the Gottsegens to make future payments on the Gilberts’ behalf. The May 19, 1986 promissory note, which establishes an obligation on the part of the Gilberts to repay any mortgage payments “made after” the date of the note by the Gottsegens on behalf of the Gilberts, clearly contemplates that the Gottsegens might make such mortgage payments after the date of the agreement; however, nothing in the language establishes an affirmative obligation on the part of the Gottsegens to do so. Likewise, although the agreement provides that Dr. Gottsegen is authorized to sell the property, no language in the agreement can be interpreted to establish an affirmative obligation on the part of Dr. Gottse-gen to do so. To authorize one to undertake an act is not the same as to require him to undertake it. Furthermore, the Gilberts have identified no consideration received by Dr. Gottsegen for the purported undertaking of these alleged unilateral obligations.
We find that the Gilberts have failed to put forth any genuine issues of material fact on their contractual claim, and conclude that summary judgment on that claim in favor of Dr. Gottsegen and CSA is appropriate.

Tort Claims

The Gilberts’ claims in tort are based upon their assertion that when Dr. Gottse-gen settled the deficiency judgment with NIS, a written satisfaction of judgment was prepared that released all of the judgment debtors, including the Gilberts. They argue that since the judgment was satisfied in full and all defendants were released, there no longer existed a valid and enforceable judgment, and Dr. Gottse-gen’s and his former attorneys’ efforts to collect on that 11 Judgment were fraudulent. The Gilberts do not dispute that they were not parties to the settlement and that neither they, nor their then attorneys, participated in the negotiation of the settlement, and therefore have no personal *296 knowledge regarding it. They allege that they were actually not aware of the purported written satisfaction of judgment until 2009, some ten years after the fact, when Lawrence Dodd, president of NIS, and William Hall, counsel for NIS, indicated to them that there was such a document. In support of their assertion that a genuine issue of material fact exists as to whether a written satisfaction of judgment was executed, the Gilberts point to affidavits of Mr. Dodd and Mr. Hall, in which they state that there was a written settlement agreement. When these affidavits were executed in 2009, ten years after the fact, Mr. Dodd and Mr. Hall did not have a file regarding the transaction or any other documents to review. These affidavits, executed at the request of the Gilberts’ counsel, were based strictly upon Mr. Dodd’s and Mr. Hall’s recollections of the negotiations and settlement which had occurred ten years prior. In' a subsequent deposition, Mr. Dodd indicated that he could not testify regarding the specifics of the settlement and that he “sort of generically expected there would be a release, because that’s generally how these things are done.” And Mr. Hall, in his subsequent deposition, acknowledged that his recollection of the settlement was poor. Dr. Gott-segen and his former attorneys deny that a written satisfaction of judgment ever existed. To date, no one involved in this matter has produced the purported written satisfaction of judgment.
Although we have serious reservations about whether the belated affidavits of Mr. Dodd and Mr. Hall are sufficient to raise a genuine issue of .material fact regarding the existence of a written satisfaction of judgment, we conclude that the existence or non-existence of such document is not dispositive of the question of defendants’ entitlement to summary judgment on the Gilberts’ tort claims. Either l^the Gil-berts fail to recognize the distinction between conventional subrogation and legal subrogation, which arises by operation of law, or the existence of legal subrogation at all. This distinction, and the existence of legal subrogation rights in favor of Dr. Gottsegen, is critical to a determination of the viability of the Gilberts’ tort claims based in fraud.
Louisiana Civil Code article 1804 provides, in pertinent part:
Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary.
A solidary obligor who has rendered the whole performance, though subro-gated to the right of the obligee, may claim from the other obligors no more than the virile portion of each.
“Subrogation is the substitution of one person to the rights of another. It may be conventional or legal.” La. C.C. art. 1825. Conventional subrogation is provided for in Louisiana Civil Code article 1827 as follows: “An obligee who receives performance from a third person may sub-rogate that person to the rights of the obligee, even without the obligor’s consent. That subrogation is subject to the rules governing the assignment of rights.” “Subrogation takes place by operation of law ... [i]n favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment ...” La. C.C. art. 1829 (Emphasis added). Conventional subrogation contemplates the obligee’s consent and affirmative action to transfer his rights; it takes place by virtue of an agreement whereby the obligee transfers his rights in a debt to a third person. *297 Legal subrogation, on the other hand, takes place by operation of law as a result of the payment of the debt by one obligor on behalf of his co-obligors. There is no additional requirement that the obligee take action to transfer his rights to the settling co-obligor.
Assuming, arguendo, |isthat there was a written settlement agreement that failed to contemporaneously subrogate Dr. Gott-segen to NIS’s rights in the deficiency judgment, and that the subsequently prepared documents containing subrogation rights in favor of Dr. Gottsegen and CSA were an after-the-fact attempt to establish conventional subrogation rights, Dr. Gott-segen nevertheless maintained a valid and enforceable right of legal subrogation to collect from the Gilberts their virile share of the settlement of the NIS deficiency judgment. While a written settlement agreement that released all obligors and did not contain conventional subrogation rights in favor of Dr. Gottsegen may have fully satisfied the NIS judgment itself, and precluded future collection efforts by NIS on the judgment, rendering it subsequently unassignable, such document would have absolutely no effect upon, and would not extinguish Dr. Gottsegen’s legal subrogation rights to collect the Gilberts’ virile share of the judgment from them. Dr. Gottsegen’s legal subrogation rights arose by virtue of his payment of the judgment, not by virtue of any grant of subrogation rights by NIS.
There is no dispute that the Gilberts were co-obligors on the Pelican Homestead note with the Gottsegens, that NIS obtained a valid and final deficiency judgment against the Gilberts and the Gottse-gens in which they were solidary debtors, and that Dr. Gottsegen, by settling their solidary obligations on the judgment, became legally subrogated to NIS’s rights and entitled to collect the Gilberts’ virile share of the judgment from them pursuant to Louisiana Civil Code article 1829. Dr. Gottsegen’s and his attorneys’ efforts to collect pursuant to his valid and enforceable legal subrogation rights, even if they utilized conventional subrogation rights that were allegedly not properly perfected, do not constitute fraud.
| uLouisiana Civil Code article 1958 defines fraud as “a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.” Dr. Gottse-gen’s collection of a valid and enforceable debt from the Gilberts is in no way obtaining an unjust advantage over them, and certainly does not cause them a loss or inconvenience, especially when Dr. Gottse-gen generously agreed to accept $80,000 from the Gilberts on a minimum virile share of $225,000. At most, if the alleged written settlement agreement exists with the terms claimed by the Gilberts, then the Gilberts’ complaints regarding Dr. Gottse-gen’s and his attorneys’ efforts to collect this valid and enforceable debt would have amounted to objections to allegedly erroneous procedures being used. By voluntarily settling this debt for $80,000, the Gilberts rendered any such objections moot.
CONCLUSION
Upon de novo review, we conclude that there remain no genuine issues of material fact on the Gilberts’ breach of contract or tort claims, and that defendants are entitled to judgment as a matter of law. We therefore affirm the judgment of the trial court granting defendants’ Motions for Summary Judgment. All costs of this appeal are assessed to the appellants.

AFFIRMED.

. The property is located at 145-151 Riverside Mall in Baton Rouge, Louisiana.

. Pelican Homestead became insolvent in 1992 and its assets were taken over by the Resolution Trust Corporation. The Gilbert/Gottsegen note was subsequently sold to NIS in 1994.

. A November 15, 1982 appraisal of the property showed its value as $683,400; the property sold at sheriffs sale on December 13, 1995, to NIS for $100,633.45.

. See, National Info. Servs. Ex rel. Resolution Trust Corp. v. Gottsegen, 98-CA-528 (La.App. 5 Cir. 06/01/99), 737 So.2d 909.

. In addition to naming CSA, Mr. Hoffman and Mr. Roux as additional defendants in the amending petitions, the Gilberts also named as defendants Lowe, Stein, LLP (Mr. Hoffman's and Mr. Roux's law firm), its insurer, Those Certain Underwriters at Lloyd’s, London subscribing to Policy Nos. B0621PLOW00209 and B0621PLOW00210, and Deutsch, Kerrigan and Stiles, LLP (a subsequent employer of Mr. Roux's during the time period in question).