EDWIN A. LOMBARD, Judge.
hThe Appellant, CM Design, L.L.C., seeks review of the September 30, 2015 judgment of the district court denying its detrimental reliance claim against the Ap-pellee, the City of New Orleans. Finding that the district court did not err, we affirm.
In 2009, Alabama-based motorcycle manufacturing business, Confederate Motors, Inc. (“Confederate”), responded to a Request for Proposals issued by the City of New Orleans (“the City”) for an Urban Development Action Grant (“UDAG”) loan in the amount of $750,000. Confederate Motors,. Inc. later created a new limited liability company, CM Design, L.L.C. (“CMD”), at the City’s request.[1]
Through the UDAG program, the City lent money to chosen borrowers to foster economic development in post-Katrina New Orleans. The City invited applications for loans under the program, which included the requirement that financial statements be provided. Successful applications would result in loans memorialized in Cooperative Endeavor Agreements (“CEA”) lasting seven to ten years.
^^Subsequently, the City advised CMD, via correspondence (“the Pre-Approval Letter”) dated August 25, 2009, that it was preliminarily approved for the UDAG loan. On January 7, 2010, the New Orleans City Council passed an ordinance authorizing the Mayor[2] to execute a CEA with CMD *747 and memorializing the UDAG grant awarded to CMD. CMD’s ..President, Pamela S. Miller, signed a CEA on January 26, 2010; however, the Mayor did not sign the CEA.
On February 9, 2010, CMD entered into a sublease agreement with South Coast Solar (“SCS”) for commercial space located at 733 St. Joseph Street in New Orleans. The sublease period ended in December 2010. CMD admits that the CEA was still unsigned by the Mayor at this time. Prior to sub-leasing the commercial space, SCS was leasing the subject commercial space from Delta Staff Leasing (“DSL”).
In May 2010, Mitchell J. Landrieu was sworn in as the Mayor of New Orleans. As a result of the mayoral administration change, Aimee Quirk (Ms. Quirk) was hired and served as an Economic Development adviser to Mayor Landrieu. Ms! Quirk reviewed CMD’s finances in connection with the UDAG loan application and deemed them to be insufficient. Determining that CMD’s financial documents were actually those belonging to Confederate, the City concluded that CMD did not have its own assets; thus, it lacked adequate security to secure or collateralize the UDAG loan. The City, consequently, informed CMD that a letter, of credit or another type of acceptable collateral would be required, via an e-mail dated May 11, 2011.
Ultimately, the CEA was never executed by Mayor Landrieu. CMD eventually became delinquent on its rent .to SCS, which did not pay DSL pursuant [ 3to the original lease. In May 2011, DSL filed suit against SCS to recover the unpaid rent. SCS filed a third party demand against CMD, which filed a third party demand against the City of New Orleans seeking to recover damages under the theory of detrimental reliance. CMD’s third party demand against the City was later severed from DSL’s suit and SCS’ third party demand.[3]
In May 2014, the City filed a motion for summary' judgment arguing that CMD could not meet the burden of proof for its detrimental reliance claim. The district court denied the motion. Trial was held on July 30, 2014. At trial, the district' court heard the testimony of CMD’s witnesses Matthew Chambers, the CEO and chairman of Confederate, ‘ and Pamela Miller, an administrator for 'Confederate Motors, who facilitated the UDAG loan application with the City. Three witnesses testified on the City’s behalf: Margaret Frazier, the Business Services Manager for the Office of Economic Development, Ernest Gethers, Jr., the Director of the Office of Business Services for the City of New Orleans, and Ms. Quirk. At the conclusion of the trial, the district court ruled in favor of the City dismissing CMD’s claims with prejudice.[4]
CMD timely filed the instant appeal. Its sole assignment of error is that the district court erred in finding that it was not justified in relying upon the City’s representations to its detriment.
Judgments on detrimental reliance claims are reviewed under a manifestly erroneous .or clearly wrong standard. Inter City Exp., Inc. v. Mallory Grp., Inc., unpub., 06-1340, p. 2 (La.App. 4 *748 Cir. 5/16/07), 2007 WL 7711153. Great | ¿deference is given tó the findings of the trier of fact “for they are in a better position to judge the credibility of the witnesses.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
La. Civ.Code art. 1967, entitled Cause defined; detrimental reliance, provides:
Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. Luther v. IOM Co. LLC, 13-353, p. 10 (La.10/15/13), 130 So.3d 817, 825. “Detrimental reliance is not. based upon the intent to be bound. Rather, the basis of detrimental reliance is ‘the idea that a person should, not harm another person by making promises that he will not keep.’” Swire v. Lafayette City Par. Consol. Gov’t, 04-1459, 04-1459, 04-1460, 04-1466, p. 31 (La.4/12/05), 907 So.2d 37, 59 [citations omitted]. Thus, the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner ‘that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment. Id., 04-1459, 04-1460, 04-1466 at pp. 31-32, 907 So.2d at 59.
 Claimants- raising a- detrimental reliance claim must meet a three-prong test: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in | ¡^position to one’s detriment because of the reliance. Id., 04-1459, 04-1460, 04-1466 at p. 31, 907 So.2d at 59. “Estoppels are not favored in our law; therefore, a party cannot avail himself of that doctrine if he fails to prove all essential elements of the plea.” Luther, 13-353 at p. 11, 130 So.3d at 825.
CMD avers that under the facts of this case, all three factors were met. It maintains that the City made a representation to it through the Pre-Approval Letter and through requiring CMD to obtain a lease within New -Orleans for its operations. It argues that it relied upon the City’s representations, including the requirement that it lease land in New Orleans to operate its business, in order to receive the UDAG loan. This reliance, they aver, was justifiable and reasonable. Lastly, they contend that the City’s subsequent refusal to honor its. obligation to grant the loan to CMD’s detriment caused it to default on the sublease.
The City’s new administration’s refusal to fund the UDAG loan caused CMD to default on- the sublease it alleges the City required it to have. CMD alleges that it learned of the City’s decision 15 months after'the lease was executed, and, thus, any possible mitigation of its losses was negated.
The district court erred, it argues, in holding that a detrimental reliance claim would be valid if the Mayor had signed the CEA. If the Mayor had signed the CEA, under the circumstances, CMD avers that it would have a claim for breach of contract instead of detrimental reliance. The district court did express that it believed that the City made a representation “by word of [sic] conduct.” The district court, *749 nevertheless, reasoned that CMD was unable to demonstrate that its’ reliance upon the unsigned CEA was well-founded. CMD contends that it was never told that it should wait until the Mayor signed the CEA prior to meeting the | ¿requisite loan stipulations. It avers that had it not met the loan stipulations the CEA would not have been presented to the Mayor for signature. . ,
■. CMD contends that the. August‘25, 2009 letter was actually an ■ approval letter. CMD represents that the City’s approval letter coupled with, the City’s following actions constitute sufficient facts upon which CMD relied: e-mails and .conversations between the parties; the. January 2014 closing; the accompanying repayment schedule; a promissory note with a personal guarantee; a list of required stipulations necessary for the funding of the loan; and the City-Council approved ordinance authorizing the Mayor at the time to execute the CEA with CMD. It avers that it reasonably relied upon all of the above-referenced actions of the City to its detriment.
The opening sentence of the City’s August 25,2009 letter states; ■ ■
[w]e are pleased to advise you that your application for a 2009 Urban Develop [sic] Action Grant (UDAG) Loan has been approved subject to the satisfaction of the teims and conditions set forth herein. [Emphasis added].
The letter further states that:
The award of these funds is also contingent upon supplying all required documentation for Loan closing to ORDA[5], and final approval from the New Orleans City Council authorizing the City to enter into Cooperative Endeavor Agreement (CEA).'': ’
Furthermore, the district court heard testimony from the City’s witnesses that CMD was required to have sufficient assets to collateralize the UDAG loan. The witnesses further • explained that " the UDAG process was not cohiplete until the Mayor signed the CEA.
17For instance, Ms. .Frazier testified that it was her understanding that .after CMD received preliminary approval that there would be further documentation requested of CMD from the City. Mr. Gethers testified that CMD was told at the January 26, 2010 closing' that the CEA was not approved until it was signed by the Mayor.
Additionally, Ms. Quirk testified that after she began working for the City in May 2010, she reviewed CMD’s UDAG application discovering that there were various unresolved issues that remained before the loan could be finalized. She realized' that there was a publicly-traded company named Confederate, but CMD, the entity that was to receive the loan, was an asset-less start-up company. She explained that “one of the important parts about the loan was making sure the ' security was adequate. That was something that was a condition and something that before I would sign off oh the loan with public dollars I wanted to make sure the city gets paid back.” ■
Ms. Quirk further testified that she discovered that Confederate and CMD were separate entities. She pulled SEC filings for Confederate for 10 years arid discovered that there was no agreement between the two entities. She further learned that Confederate was in substantial financial trouble and was operating at a .deficit. Ms. Quirk explained that as a result of her’findings she had reservations about *750 proceeding with the loan, and so informed CMD. She testified that she e-mailed the Chief Financial Officer of Confederate, Joseph Mitchell, advising that upon her review of their financials, the City was unable to extend the loan without credit support provided by a Letter of Credit or another form of acceptable collateral. She further testified that a CEA was drafted, but not issued by the City because the Mayor never signed the CEA, which is ineffective until so signed!
IsMr. Chambers testified that CMD was informed 15 months after the January 26, 2010 closing that the UDAG loan would not be funded. CMD entered into the lease after the January 26, 2010 closing, knowing that Mayor Landrieu had not signed the' CEA. He further testified that Confederate’s Board of Directors did not approve of CMD’s move to New Orleans until September 2010, seven months after the sublease was signed. Mr. Chambers explained that CMD was a wholly-owned entity of Confederate and that there was a working agreement between the two companies that “it’s obligations were the obligations of Confederate Motors Inc. and that it could pledge any and all assets of Confederate Motors and that Confederate Motions, Inc. was required to pay for any obligation on behalf of CM Design ...” However, his testimony on the existence of a working agreement was later impeached.
Based upon the facts of this matter and the burden of proof required to sustain a detrimental reliance claim, CMD has not established that the district court was manifestly erroneous or clearly wrong in ruling in the City’s favor. CMD subleased commercial space in New Orleans knowing that the CEA needed to be executed and having been advised by the City that it was only conditionally approved for the UDAG loan. CMD’s reliance upon the City’s preliminary approval in securing commercial space in New Orleans was not justified. There is no evidence that the City required CMD to lease space in New Orleans prior to the Mayor signing the CEA. Furthermore, had that been the case, as was noted at trial, CMD should have included the execution of the CEA as a requirement of the sublease.
Furthermore, our court has held that La. Civ.Code art.1947 is designed to preclude “the jilted party from making a [detrimental ■ reliance] claim when the | ^negotiation process breaks down.” JCD Mktg. Co. v. Bass Hotels & Resorts, Inc., 01-1096, p. 10 (La.App. 4 Cir. 8/6/02), 812 So.2d 884, 841. We reasoned that the failure of the parties in that matter to reach the contemplated written agreement rendered the plaintiffs “purported reliance” on the defendant’s assurances unreasonable. Id. In that matter, we held that the district court correctly dismissed the plaintiffs detrimental reliance claim. Id.
Similarly, in the matter sub judice, as the City’s correspondence lucidly states, a written agreement, the CEA, was clearly contemplated by the parties. Thus, CMD is precluded from asserting a detrimental reliance claim where the loan process was halted because of its financial instability, and the CEA was never signed by Mayor Landrieu. It was unreasonable for it to rely upon any of the City’s alleged assurances where the contemplated written agreement was not executed. This assignment of eiTor is without merit.
DECREE
For the foregoing reasons, the September 30, 2015 judgment of the district court is affirmed.
AFFIRMED.
BONIN, J., concurs in the result.

. Confederate created the new entity after being informed by the City that its original name was offensive and should be changed if the loan process was to continue.

. The Mayor of New Orleans at the time was *747 Clarence Ray Nagin, Jr.

. CMD settled with DSL and SCS.

. The district issued its initial judgment on August 20, 2015. However, this Court, in 2014-CA-1328, determined that said judgment lacked required decretal language, and the appeal was dismissed without prejudice and remanded to the district court. See Delta Staff Leasing, LLC v. S. Coast Solar, LLC, 14-1328 (La.App. 4 Cir. 9/23/15), 176 So.3d 668.

. ORDA stands for’ the Office of Recovery Development & Administration for the City of New Orleans.